# THE STATE ex rel. APPLEGATE et al. v. TAYLOR et al., Judges of the County Court, et al.

### In Banc, December 21, 1909.

1. **DRAINAGE DISTRICT: Petition: Signed by All Landowners.** The petition for the establishment of a drainage district under article 4, chapter 122, Revised Statutes 1899, is not required to be signed by all the persons owning land in the proposed district. It is not defective because it states the names of no landowners other than the petitioners.

2. ————: ————: **Description of Lands.** The petition for the establishment of the proposed drainage district need not contain a description of the lands to be embraced in the proposed district.

3. ————: ————: **Route and Termini.** It is not required that the petition for the drainage district contain the true description, starting point, route, and terminus of the proposed ditch. It is sufficient if it contain a "general description of the proposed ditch, starting point, route and terminus."

4. ————: ————: **Width of Ditch.** Where the statute does not require the petition to state the width of the ditch to be constructed, it is not necessary that it do so.

5. ————: ————: **Landowners: Affected by, Etc.** A petition reciting that, "We, your petitioners, resident freeholders of Chariton county, and each owning swamp and overflowed land adjacent to the Chariton River, believing it would be conducive, etc., to cause said Chariton River to be so constructed, straightened, widened, altered or deepened, as to prevent the frequent overflows of said river and the great damage to lands adjacent thereto," meets the statute requiring the petition to be signed by landowners whose lands will be affected by or assessed for the construction of the ditch.

6. ————: ————: ————: ————: **Adjudicated by County Court: Certiorari.** And the finding of the county court that the petition was signed by more than five landowners whose lands would be affected by and assessed for the construction of the ditch, was an adjudication of the sufficiency of the petition in that respect which will not be reviewed on *certiorari*.

7. ————: ————: **Bond: Jurisdictional.** The filing of a bond in connection with the petition for the establishment of a

drainage district, as required by section 8279, Revised Statutes 1899, is not jurisdictional. The bond required is simply a cost bond, obligating the petitioners to pay the costs of the proceedings in case the court should deny the petition, and has nothing to do with the merits of the case; and the proceedings will not be quashed upon *certiorari* because the bond filed was insufficient in that it did not distinguish between principals (petitioners) and sureties, and did not purport to be signed by two sureties and did not declare they were freeholders, although in fact it was so signed. The bond is wholly collateral to the process of the court. The filing of a sufficient petition vests the county court with jurisdiction over the subject-matter.

8. ——: ——: Notice: Newspaper of General Circulation. The statute requires notice of the pendency of the petition for the establishment of a drainage district and of the appointment of viewers, etc., "to be given by publication by one insertion in some newspaper of general circulation published in said county," and the record shows the notice was published in said "Salisbury Press-Spectator, a newspaper published in the city of Salisbury," but the proof of publication filed by the publisher does not state that it was a newspaper of general circulation. *Held*, on *certiorari* to quash the proceedings of the county court, that it will not be held that the notice was not published in a newspaper of general circulation. In the absence of all evidence on the subject the presumption is that it was a newspaper of general circulation, and upon that presumption alone the county court might well have found it was such paper. But, aside from that presumption, the court in passing upon the proof of publication acted within its jurisdiction, will be presumed to have found, as the record recites, the newspaper was one of general circulation, for without such finding it had no authority to proceed further. It was not in its inquiry to the affidavit of the publisher.

9. ——: Notice: Sufficiency. A preliminary notice, giving the names of the petitioners for the drainage district, reciting the filing of a petition in the county court asking the court to make the necessary order and cause to be constructed, straightened, widened, altered or deepened the Chariton river in said Chariton county, giving the point of commencement, on the Macon county line, at a given sectional point, and "following the present river bed as near as practicable until it reaches the Missouri River" at another given sectional point, and stating that "the line of the proposed ditch or improvement is more particularly and definitely described by a profile and plat accompanying said petition and on file" in the office of the county clerk, and in all other respects in conformity to the statute, is sufficient to vest jurisdiction of the court over the landowners

of the district and their lands to make the preliminary orders looking to the formation of the district, since it was to be and was subsequently followed by another notice, under section 8287, Laws 1905, giving the boundaries of the district, the description of each lot or tract embraced therein, and the name of the owner thereof. Such a notice was sufficient to accomplish the purpose of the statute, namely, to notify all persons whose lands "were liable to be affected by or assessed for construction" of the pendency of a petition to establish a drainage district.

10. ———: ———: **By Service or Publication: Change in Statute.** Where the statute in force at the time the petition was filed required notice by personal service, but before notice was given the statute was so changed as to require notice by publication, notice given by publication was sufficient and valid. Such change relates only to procedure in court, and therefore the constitutional inhibition against retroactive laws does not apply.

11. ———: **Exceptors: Cost Bond: Unconstitutional Statute.** Exceptors cannot complain that the statute required them, as a precedent condition to their right to file exceptions and objections to the proceedings to establish the drainage district, to give a cost bond, if they were permitted to file their exceptions and make their objections without being required to file such cost bond. Besides, in this case, such statute was repealed several months before their exceptions were due, and hence its invalidity in no sense affected their rights.

12. ———: **Initial Expenses: County Revenue: Constitutional Statutes.** The county court may order to be paid, and the county treasurer may pay, the damages and initial expenses of a drainage district out of the "contingent fund" designated by section 9283, Revised Statutes 1899, and if that is done sections 8299 and 8306 are not brought into conflict with sections 9283 and 9287, Revised Statutes 1899. All can stand, with that interpretation. They are not in irreconcilable conflict.

13. ———: ———: ———: ———: **Reimbursement.** And the fact that the county is to be reimbursed by the drainage district for the money so paid out for damages and initial expenses, does not affect the validity of the statutes.

14. ———: ———: ———: ———: **Appropriations by Legislature.** A drainage district organized under article 4, chapter 122, Revised Statutes 1899, is a public corporation, and under the sole and exclusive charge and control of the county court; and the Constitution does not prohibit the General Assembly from making use of such a corporation as a means through

which it may apply the public revenues of the county to a lawful public purpose, such as paying out of its "contingent fund" the damages and initial expenses growing out of the formation of a drainage district.

15. ———: ———: ———: Omission Would Not Affect Validity. The provisions found in sections 8299 and 8306, providing for the payment of the damages and initial expenses of a drainage district, may be omitted or eliminated, and yet the rest of the act would be valid, and said elimination would not render the balance of the act inoperative. These parts, if invalid, may be separated from the rest, and the valid parts remaining prescribe a complete rule of action capable of enforcement.

16. ———: Damages: Compensation: Validity of Statute: Certiorari. Where the record in *certiorari* does not show that any private property was taken or damaged for public use before just compensation was paid therefor, but does show that whatever lands were taken or damaged were taken or damaged and paid for some time before the institution of this *certiorari* suit, the court will not determine whether or not the statute is void as authorizing the taking or damaging of private property for a public use without just compensation.

17. ———: Condemnation: Judicial Powers in Viewers. The decision of the county court on the question of locating the ditch and the details of the improvement, etc., is not entirely controlled by the viewers. Interested parties have the right to file remonstrances and exceptions to the report, and frame issues, introduce evidence, and otherwise to be heard upon the propriety, justice and legality of the proceedings. And hence section 8284, Revised Statutes 1899, is not unconstitutional as delegating judicial power to the viewers.

18. LAWS: Read Three Times: Shown by Bill. While the printed Journal of the House does not show that the bill was read three times, yet if that fact is shown by the endorsements on the bill itself, and the Senate Journal and endorsements show it was read three times, these affirmative endorsements should be held to outweigh the negative showing of the House Journal.

19. DRAINAGE DISTRICT: Local Law. Article 4 of chapter 122, Revised Statutes 1899, providing for the organization of drainage districts, is not a local law. It applies to all who are embraced within its provisions.

20. ———: Equal Protection. The drainage laws do not violate that portion of the United States Constitution which says that no state shall make or enforce any law which will "deny to any person within its jurisdiction the equal protection of the laws."

21. ———: **Bonds: Cancellation and Reissue.** The county court has power, when bonds of the drainage district are of such denominations that they cannot be sold advantageously, to order them cancelled and the appropriation of the proceeds thereof set aside, and to order the issue of other bonds of a different size, their sale, and to reappropriate the proceeds to district expenses.

22. ———: ———: **Denominations.** The county court can fix the denomination of drainage district bonds at any size not less than one hundred dollars each, under article 4, chapter 122, Revised Statutes 1899.

23. ———: **Condemnation: Watercourses: Damages.** The drainage laws, and the Constitution, which is self-enforcing, permit owners of land bordering a river to recover damages for their property rights in the stream in its natural state, when taken or damaged by the drain construction.

24. ———: **Natural Stream.** Under section 8278, Revised Statutes 1899, as amended in 1903, a drainage district may be organized to straighten, widen, alter or deepen a natural stream, not navigable.

25. ———: ———: **Navigable: Public Highway: Chariton River.** A navigable stream is one actually capable of floating and of permitting the passage of ordinary boats upon the bosom of its waters. The General Assembly did not by declaring the Chariton River "a public highway" intend to declare it to be navigable, it not being navigable in fact. The purpose of the act was to preserve the free flow of its waters and their use for the owners of grist-mills and other machinery along its banks.

26. ———: ———: ———: **Surveyed and Sold by U. S.** While it is true as an abstract proposition of law, that, where the United States surveyed and sold to private persons the lands over which the waters of a river flowed, the General Assembly has no power to declare such river a public highway, yet that does not prevent the General Assembly from exempting such streams from the operation of its drainage laws, and excluding them from the drainage district.

## Certiorari.

WRIT QUASHED.

*Crawley & Rucker* and *Tyson S. Dines* for relators.

(1) The petition should show all jurisdictional facts. Railroad v. Lewright, 113 Mo. 660; St. Louis

v. Gleason, 89 Mo. 67; Kansas City v. Mastin, 169 Mo. 80; Baubie v. Ossman, 142 Mo. 499. Here the petition contains no description of the ditch. Contains no description of the lands to be embraced in the proposed district. Gives no names of landowners other than the petitioners. Does not give the width of the strip of land to be condemned. Does not give a true description of the beginning, route or terminus of the ditch. Does not even give the course. Does not show that the petitioners possessed the statutory qualifications. Township v. Probate Judge, 53 Mich. 130. The law is and has ever been in condemnation proceedings that the petition must set forth the specific purpose for which the exercise of eminent domain is sought, and that it is necessary to take the property condemned for the specific purpose stated in the petition. 14 Cyc. 1031, note 43; Ib. 1030, note 40; Patterson v. Behr, 161 Mo. 513; Mattias v. Drainage Comrs., 49 Mich. 465; Frost v. Leatherman, 55 Mich. 33; Whiteford Twp. v. Monroe County, 53 Mich. 133. The rule is universal that the petition must set forth every jurisdictional fact. The petition here fails of this in every particular. St. Louis v. Gleason, 89 Mo. 67; City of Hopkins v. Railroad, 79 Mo. 98; Jefferson County v. Cowan, 54 Mo. 234; School District v. Oeillien, 209 Mo. 464; Railroad v. Storey, 96 Mo. 620; Cory v. Railroad, 100 Mo. 288; Railroad v. Townsite Co., 103 Mo. 569; Railroad v. Swan, 120 Mo. 30; Whitely v. Platt County, 73 Mo. 30; Zimmerman v. Snowden, 88 Mo. 218; Railroad v. Railroad, 94 Mo. 542. Wherever property is sought to be taken for public use, the petition should either give the names of landowners or a description of the lands. Seifener v. St. Louis, 141 Mo. 586; Miller v. Graham, 17 Ohio St. 1; Railroad v. Smith, 78 Ill. 96; Richard v. Cypremont Drainage Dist. 32 So. (La.), 27. (2) The statute requires a bond with two freehold sureties. The bond here does not purport to be signed by sureties, and there is not one

word in the record to show that Shire and Karcher signed as sureties, or were freeholders. Casey v. Burt County, 59 Neb. 624. (3) The proof of publication of the first notice is bad for the reason that the statute expressly requires that the publication shall be in a newspaper of "general circulation," and there is nothing in this record to show that the Salisbury Press-Spectator is or was a newspaper of "general circulation." Kern v. State, 35 Neb. 676. (4) The preliminary notice was bad. The object of a notice affecting property rights is to advise persons concerned of the character of the proceedings. In this case the notice gives no names save the petitioners, describes no lands, outlines no district; but simply invites persons concerned to come to the court house and look at a map. This was not the notice the statute required. Williams v. Kirby, 169 Mo. 622. (5) None of the orders of the county court contain the necessary jurisdictional recitals demanded by the foregoing authorities. They do not even set forth that the stream is in fact "not navigable"—a finding rendered necessary as the very foundation of the whole proceeding. Laws 1903, p. 234; Fox v. Holcomb, 34 Mich. 298. (6) The Act of 1899 has no application to natural streams. The terms "ditch, drain and watercourse" as used in that act, section 8278, did not include living streams. Green County Comrs. v. Harbine, 74 Ohio St. 318. By the Act of 1903 (p. 234) the operation of Art. 4, Chap. 122, R. S. 1899, was expressly limited to "natural streams—not navigable." Whereas the Grand Chariton has been recognized by the State as a public highway from the Iowa line to its mouth since 1845. Laws 1845, p. 299. Such enactments were common between 1839 and 1849. See Acts 1839, pp. 81-87-88; Acts 1841, pp. 114-115; Acts 1843, pp. 69-70; Acts 1845, p. 299; Acts 1848, pp. 120-121; Acts 1855, pp. 474, 538 and 625. There can be no question of the right of the State to enact legislation of this character. It is the accepted

doctrine that State Legislatures may control all rivers within their boundaries until Congress actually exercises its paramount authority in the interests of interstate commerce. Escanaba Co. v. Chicago, 107 U. S. 678; Cooley, Const. Lim. (6 Ed.), p. 728; Wilson v. Black Bird Co., 2 Pet. 245. Having solemnly recognized and asserted the navigability of this great tributary of the Missouri river the State was pledged to maintain the stream in its natural condition. Wood v. Fowler, 26 Kans. 682; Selman v. Wolfe, 27 Tex. 68; Coövert v. O'Connor, 8 Watts (Pa.), 470; Union Canal Co. v. Landis, 9 Watts 228; Deddrick v. Wood, 15 Pa. St. 9; Barclay R. & C. Co. v. Ingham, 36 Pa. 194; Dubois v. Glaub, 52 Pa. St. 238; Witt v. Jefcoat, 10 Rich. L. (S. C.) 389; Tyrrell v. Lockhart, 3 Blackf. 136; Baker v. Lewis, 33 Pa. St. 305; Harold v. Jones, 86 Ala. 274; Minturn v. Lisle, 4 Cal. 180; People v. St. Louis, 10 Ill. 351; Atty. Gen. v. Del. Etc., R. Co., 27 N. J. Eq. 7; People v. Gutchess, 48 Barb. (N. Y.) 656; State v. Dibble, 4 Jones L. (49 N. C.) 107. The status of the stream being thus established by the Legislature as a public highway, it has ever since been a "navigable stream" within the meaning of subsequent enactments. Tyrrell v. Lockhart, 3 Blackf. 136; Walker v. Board Public Works, 16 Ohio 544; Baker v. Lewis, 33 Pa. St. 305. And having declared the Chariton a public highway of the State, it was beyond the power of the Legislature to divert the stream from its natural bed, except by express repeal of the Act of 1845. Cooley, Const. Lim. (6 Ed.), 643; 1 Farnham on Waters, p. 598; Angell on Watercourses (7 Ed.), sec. 93; Rossmiller v. State, 114 Wis. 160; Brown v. Cunningham, 82 Ia. 512. (7) The Act of 1899 is void in its entirety. The title of the act does not disclose its import. There is nothing in the title to indicate its scope. Taking it section by section it is full of unconstitutional provisions. In the first place the emergency clause, section 38, shows that the act was not designed

to apply to streams of the size and importance of the Chariton. Indeed the entire act discloses that it was only intended to affect the swamp lands of Southeast Missouri. In the second place the act devolves upon the viewers' judicial powers wholly inconsistent with their duty to view and condemn the right-of-way. State ex rel. v. Washburn, 167 Mo. 680; State ex rel. v. Ryan, 177 Mo. 205; Elliott on Roads and Streets, section 272. In the third place the statute makes the report of the viewers conclusive upon the county court. This stultifies the judicial character of the proceedings and makes the county court a mere machine to register the will of the viewers. Again the statute provides that the initial costs, damages, expenses and attorneys' fees shall be paid out of the general revenues of the county. This is clearly in violation of the constitutional provisions prohibiting the loaning of the credit of the State under Sec. 45, and the granting of public money under Sec. 46 and 47, Art. IV, of the State Constitution. Martin v. Drainage Comrs., 60 N. W. (N. D.) 392. Again Sec. 8292, R. S. 1899, and the same section in the Laws of 1903, p. 235, makes the giving of a cost bond a condition precedent to the filing of exceptions. Thus denying or putting a price upon justice in violation of Sec. 10, Art. 2, Const., Mo. Yet another absurdity in the law of 1899, is the provision that the landowner living adjacent to the ditch shall keep it free of willows and obstructions, under penalty of having the county court appoint "some person," qualifications unspecified, to assess the cost of cleaning the ditch against the abutting landowner. Sec. 8306. Yet again the law of 1899, makes no provision for the autonomy of the district. It says that the territory embraced within the limits recommended by the viewers, shall constitute a drainage district, and by the act of 1907, the district is declared to be a body corporate, yet no one is empowered to act for the district, nor is anybody authorized to sue in the district's be-

half, or to be served with process. Indeed the return to the writ in this very case shows there is no one upon whom the writ could be served. Taking all these points together, and treating the act of 1899 as an entire scheme we insist that its provisions are so uncertain, absurd, vague and preposterous as to be void. State ex rel. v. Ashbrook, 154 Mo. 375; State ex rel. v. Stephens, 146 Mo. 622; State ex rel. v. Nast, 209 Mo. 732; State v. Williams, 77 Mo. 313; State v. Bockstruck, 136 Mo. 335; State ex rel. v. Warner, 197 Mo. 650; State v. Kring, 74 Mo. 612; Copeland v. St. Joseph, 126 Mo. 417. The constitutional requirement that a legislative bill shall contain but one subject and that subject be clearly expressed in its title, was obviously ignored in the Act of 1899 (Laws 1899, p. 278). There is nothing in the title of that enactment indicative of a legislative design to repeal statutes governing the appropriation and disbursement of general county revenues. Yet secs. 8299 and 8306, Revised Statutes 1899, authorizing the payment of damages and initial expenses of drainage ditches out of county funds raised by general taxation can only be upheld upon the theory that they by implication repeal sections 9283 to 9287, which require each fund to be sacredly devoted to specific uses, and forbid, under severe penalties, their diversion to other purposes. (8) The title to the amendment of 1903—Laws 1903, p. 234—reads as follows: "Lands: drainage of swamp and overflowed lands. An Act to amend Section 8278, Art. 4, Chapter 122, Statutes of Missouri, 1899. Section 1. County court may construct and alter ditches. 'Ditch' defined." There is nothing in this title or caption indicating an extension of the law of 1899 to living streams, yet respondents must rely upon the amendment of 1903 because the words "ditch, drain, or watercourse" in the law of 1899 have no application to living streams. Green Co. Com. v. Harbine, 74 Ohio St. 318. The Act of 1903 should therefore be held void for failure to

disclose its subject in the title. (9) The proceedings
under consideration are to be judged by the law as it
stood in 1903, and not by the law as amended in 1905.
The Act of 1905 expressly provides for the completion
of proceedings theretofore begun, under the provisions
of the sections repealed. And even if this were not the
case the Act of 1905 would not operate retroactively,
retroactive laws being prohibited by the Constitution
*eo nomine.* Bartlett v. Ball, 142 Mo. 28. (10) The
writ of *certiorari* was rightly granted and is the only
efficient remedy. Railroad v. Morton, 27 Mo. 317;
Anderson v. St. Louis County Court, 47 Mo. 479; Rail-
road v. Young, 96 Mo. 39; Sauner v. Drainage Dist., 175
Ill. 575; Taylor v. Burnap, 39 Mich. 739; Daniels v.
Smith, 38 Mich. 660; Shepard v. Johnson Co., 72 Iowa
258. (11) Relators having a common grievance and
like interests in the relief sought, are entitled to join
in one petition. Richman v. Muscatine County, 70
Iowa 627; Cowing v. Ripley, 76 Mich. 650; Michael v.
St. Louis, 112 Mo. 610. (12) Because of the magni-
tude of the property interests involved and important
constitutional questions presented, this court should
retain jurisdiction of the case and decide it upon its
merits. State ex rel. v. Henderson, 160 Mo. 190. (13)
Failure of the Legislature to provide a lawful method
whereby landowners may be compensated for property
appropriated and damaged, renders the entire Act of
1899 unconstitutional and void. Martin v. Drainage
Comrs., 60 N. W. 292. Our State Constitution declares
that the proprietary rights of landowners shall not be
disturbed or their possession interfered with until af-
ter compensation therefor shall have been paid to the
owner, or into court for the owner. Whereas this
drainage law of 1899 (Secs. 8285-8299), contemplates
the condemnation and actual taking of the land re-
quired for the drain before compensation made or ten-
dered, and the means provided for obtaining such com-
pensation is not only inadequate but unlawful. Of

course the mere fact that the law fails to provide in terms for rightful compensation would not prevent the injured landowner from proceeding by suit to recover the same in an ordinary action; but unfortunately no provision has been made for service of process upon the district, so that a judgment against it would be as difficult to obtain and as worthless when obtained, as one against the Desert of Sahara. By an act passed in 1907 such districts are declared to be bodies corporate; but no officers or trustees are provided for, and no means afforded for the actual exercise of a single corporate power. To designate a region of country a "body corporate," without providing any way for the functions of a corporation to be exercised, is a legislative conception savoring more of practical joking than of law. (14) Condemnation proceedings are judicial proceedings and can be lawfully exercised only by courts or judicial officers. Plum v. City of Kansas, 101 Mo. 525; Thompson v. Railroad, 110 Mo. 160; Lewis, Em. Dom., sec. 158. For this reason section 8284, Revised Statutes 1899 should be held void because it undertakes to control the decision of the county court, and make such decision depend entirely upon the opinion and report of the viewers. State ex rel. v. Nast, 209 Mo. 721. It is beyond the power of the Legislature to make a judicial decision depend entirely upon the findings of non-judicial officers—because to do so is to prescribe the final value of evidence. Abbott v. Lindenbower, 46 Mo. 291; St. Louis County Court v. Griswold, 58 Mo. 175; State ex rel. v. Gaffee, 192 Mo. 670. (15) The petition for the alleged improvement shows on its face that its object was illegal, in that it was designed to destroy a navigable watercourse. Laws 1845, p. 299; Railroad v. Railroad, 94 Mo. 542; State ex rel. v. Shelton, 154 Mo. 690; Fox v. Holcomb, 34 Mich. 298. (16) Owners of lands bordering a river have proprietary rights in the stream in its natural state. This right is a property right which the Legislature cannot

lawfully destroy without affording some means of compensation. 1 Farnham on Waters, p. 598. There is nothing in the law of 1899, or in any of its various amendments providing compensation to landowners on this account, nor is there any other remedy available to the landowner whereby his damages on this score can be made good. (17) Having set aside the original order of apportionment, the county court was powerless to make the second order of apportionment and for the sale of bonds. In the first place the statutes contain no authority for the making of said second order; and in the second place the general recital in said second order amounts to nothing. Railroad v. Young, 96 Mo. 42; Zimmerman v. Snowden, 88 Mo. 218; Cook v. Farrah, 105 Mo. 492; Spurlock v. Dorman, 182 Mo. 242; Grossman v. Patton, 186 Mo. 661; Williams v. Kirby, 169 Mo. 622; In re Bledsoe Hill, 200 Mo. 630. And after the construction of the ditch was originally authorized by order of the county court, defects in that order could not be patched up by subsequent orders. Carpenter v. Grisham, 59 Mo. 247; Jones v. Zink, 65 Mo. App. 409. (18) The drainage laws in question relate only to lands "adjacent" to the proposed drain. Yet here the maps and reports show the inclusion of lands miles away on either side. What notice did these remote landowners have that their lands might be included? What warning had they to flee from the wrath to come? No notice was given them by name or otherwise in the first instance, and the order establishing the district and authorizing construction of the proposed improvement was made before the second notice was published.

*J. A. Collett* for respondents; *H. S. Oakley* of counsel.

(1) The petition filed with the county court praying for the organization of a drainage district was entirely sufficient. The petition was signed by one hun-

dred and twenty-five persons, resident freeholders of Chariton county, owning overflow land adjacent to the Chariton river. The statute only requires the signatures of five landowners 'whose land would be liable to be affected by, or assessed for, the construction of the work. Sec. 8279, R. S. 1899. The petition also accords with the statute in giving the general description of the proposed ditch. The starting point is made certain; the general course is made as certain as could be in advance of the determination of the viewers and engineer, to whom the statute refers the duty of fixing the exact location; the terminus of the ditch is also fixed at a point certain. This general description is all that the law contemplates. Sec. 8279, R. S. 1899. (2) The description of the proposed ditch as found in the petition is sufficient. The statute only requires a general description to be given by the petition yet the petitioners did more in this case; they gave a general description of the ditch and in addition filed with their petition a survey and plat, referred to therein, which gave a minute and exact description of the proposed ditch. Cory v. Railroad, 100 Mo. 282; Railroad v. Story, 96 Mo. 611; State ex rel. v. Commissioners, 87 Minn. 325. (3) The filing of the bond was not necessary to give the county court jurisdiction in the premises. The court was vested with jurisdiction of the subject-matter upon the filing of the petition and acquired jurisdiction of the persons upon the giving of the notice of the pendency of the petition. Caldwell v. Curry, 93 Ind. 363; Smith v. Clifford, 99 Ind. 113; Hall v. Slabaugh, 69 Mich. 484. (4) The published notice of the pendency of the petition was in conformity to what the statute required at the time the notice was given and was sufficient to give the county court jurisdiction of the persons who owned the lands involved in the improvement. Drainage District v. Railroad, 216 Mo. 709; Klein v. Tuhey, 13 Ind. App. 74; Hennessy v. Douglas County, 99 Wis. 129. A reference to the

notice will show that it complied with all the statutory requirements. That it advised all concerned of the pendency of the petition cannot be disputed; neither will it be denied that it gave notice of the appointment of the viewers and of the time when they would make their report. The place of beginning and the terminus of the proposed ditch were fixed so definitely and certainly that there could be no question but they could be located by a surveyor from that description. That is all the law requires. As to the sufficiency of the notice see, also, Kansas City v. Mastin, 169 Mo. 80; Munsey v. Joest, 74 Ind. 409. (5) This court will not in this proceeding inquire into the sufficiency of the bond nor the regularity or sufficiency of any of the orders of the county court made subsequent to the filing of the petition and the publication of the notice of its pendency. The petition and notice being sufficient the county court acquired jurisdiction both of the subject-matter and of the landowners, and that is as far as this court will inquire into the proceedings of the county court. State ex rel. v. Shelton, 154 Mo. 670; Ward v. Board of Equalization, 135 Mo. 319; State ex rel. v. Smith, 101 Mo. 175; State ex rel. v. Dobson, 135 Mo. 20; State ex rel. v. St. Louis Court of Appeals, 99 Mo. 221; State ex rel. v. Woodson, 161 Mo. 444; State ex rel. v. Bland, 168 Mo. 7; 4 Ency. Pl. and Prac. 98. (6) As a general rule *certiorari* cannot be substituted for appeal or writ of error but can only be resorted to where appeal or writ of error does not afford adequate relief. Fry v. Armstrong, 109 Mo. App. 482; State ex rel. v. Shelton, 154 Mo. 693; State ex rel. v. County Court, 45 Mo. App. 391; State ex rel. v. Edwards, 104 Mo. 126; State ex rel. v. Reynolds, 190 Mo. 588. Cases from this jurisdiction could be multiplied, showing that the rule is well established that the writ of *certiorari* will not issue as substitute for appeal or writ of error. This is not only the rule in this State but is the law of the land. Poe v. Machine

Works, 24 W. Va. 517; Ennis v. Ennis, 110 Ill. 78; Hauser v. State, 33 Wis. 678; Tomlinson v. Board of Equalization, 88 Tenn. 1; Devlin v. Dalton, 171 Mass. 338; State ex rel. v. Marr, 42 La. Ann. 1089, 10 L. R. A. 248. (7) Although there was no provision in the statutes under which this drainage district was organized at the time of its organization expressly authorizing an appeal from the action of the county court, in passing upon the viewers' first report, which action of the court really operated to organize the drainage district, yet as there was nothing in that statute which could be said to defeat the right of appeal, it will hardly be contended that the landowners who were by the statute expressly authorized to file remonstrances to the petition could not have appealed from the action of the county court approving the petition and organizing the district. Sec. 1788, R. S. 1899. This section fairly construed authorizes an appeal from the final determination of any case in the county court, and, for the manner of prosecuting the appeal, refers to the law regulating appeals in the justice of the peace court. The right of appeal from the justice of the peace court is fixed by Section 4059, R. S. 1899. Under these statutes it is plain that all parties aggrieved by the action of the county court in its judgment authorizing the organization of the drainage ditch, have the right to appeal. The State v. Schneider, 47 Mo. App. 669; Railroad v. Railroad, 94 Mo. 535. (8) While the rule is that in *certiorari* proceedings this court will not inquire into the regularity of the proceedings of the inferior court, yet we maintain that every act of the county court in the organization of this drainage district conformed to the statute. We shall only briefly notice the criticism lodged against the proceedings of the county court. The point is made by relators that the bond executed by the petitioners is not sufficient; that there is nothing in the record to show that Shire and Karcher signed as sureties or were freeholders.

Unfortunately for relators the record does not sustain this contention. On page 6 of relators' abstract of the record we find this language: "The said petitioners also present their bond in the sum of two thousand dollars with Thomas Karcher and Eli Shire as sureties conditioned and payable as the law directs, which is examined, approved and ordered filed." It is true that the finding of the court does not affirmatively and especially show that Karcher and Shire were freeholders, but it being a question for the county court to determine whether or not Karcher and Shire were sufficient sureties to meet the requirement of the statute and there being nothing in the record to show that they were not, it will be presumed that the county court not only found that they were freeholders, but that they possessed all the other qualifications required by law. Munsey v. Joest, 74 Ind. 409; Vincent v. Means, 184 Mo. 344; Desloge v. Tucker, 196 Mo. 587; Sims v. Sims, 121 N. C. 297; Hall v. Henderson, 126 Ala. 449; Braun v. Mitchell, 88 Tex. 350. (9) Although the statute in providing for bond and in fixing the qualifications of the sureties designated that they should be freeholders, yet this statute is only directory, and even if it could be shown that Karcher and Shire were not freeholders that would not vitiate the bond nor invalidate the subsequent proceedings of the county court. Hicks v. Chouteau, 12 Mo. 341; State ex rel. v. Findley, 101 Mo. 368. (10) There being nothing in the record before this court to show that the Salisbury Press-Spectator was not at the time of the publication of the notice of the pendency of the petition such a newspaper as the law designates, it will be presumed that the county court, whose duty it was to primarily pass upon this question, found that the Salisbury Press-Spectator was such a newspaper as answered the requirement of the statute. Munsey v. Joest, 74 Ind. 409; Sims v. Sims, 121 N. C. 297. (11) Section 8278, Revised Statutes 1899, as amended in Laws 1903, p. 234, under

which this proceeding was begun, makes express application to living streams. Not only does this statute expressly include "natural streams" but the very terms "straightened, widened, altered or deepened" following the term "constructed" shows that the purpose was not only to provide for the construction of new ditches but also to provide for the straightening and alteration of streams already existing so as to make them efficient for drainage purposes. (12) In matters of the highest import, involving the lives and liberties of citizens it has repeatedly been held by this court that statutes changing the procedure are applicable to cases which are pending at the time of the passage of the act. State v. Taylor, 134 Mo. 109; Duncan v. State, 38 U. S. Law Ed. 485; State v. Thompson, 141 Mo. 408; Trust Co. v. Donnell, 81 Mo. App. 147; State v. Jackson, 105 Mo. 196. (13) It is said by counsel for relators that the county court acquired no jurisdiction in the premises for these reasons among others: (a) That there was no finding made by the court that the Chariton river which was sought to be altered by the proposed improvement was not navigable; and (b) that the said Chariton river is in fact a navigable stream and not subject to the provisions of article 4, chapter 122, under which this district was organized. While there is no direct affirmative finding of the county court that this was not a navigable stream, yet the record before this court in respondents' return shows that in fact said stream is not navigable, and further shows, by implication at least, that the county court so found. The survey of the lands bordering this stream, including the stream itself, which is a part of the record in this case, shows that the stream was not meandered but that the survey included this stream as the Government survey included all non-navigable streams. This taken in connection with the further showing made by the record that this stream is actually owned by individual owners is, we think sufficient showing

of non-navigability of the stream; and the question of navigability of the stream having been placed in issue by the remonstrances filed the county court's action in failing to sustain the remonstrators and in ordering the construction of the proposed ditch the remonstrances notwithstanding was in effect a finding that the Chariton river was a non-navigable stream. Munsey v. Joest, 74 Ind. 409; Simms v. Simms, 121 N. C. 297; Hall v. Henderson, 126 Ala. 449; Braun v. Mitchell, 88 Tex. 350. A casual examination of briefs filed by relators' counsel plainly shows that they recognize that sufficient showing of the non-navigability of the stream, if in fact any such showing was required, is found in the record, but they undertake to avoid the force of the record by the claim that by act of the Legislature passed in 1845 this river was declared to be a navigable river. In the first place we deny that the Legislature ever undertook to declare this river a navigable river. The act upon which relators rely, passed by the General Assembly and approved March 15, 1845, reads: "That the Grand Chariton river is hereby declared a public highway, from its mouth, where it empties into the Missouri river, to the northern boundary of the State of Missouri, provided however that this act shall not be so construed as to affect the rights of any person or any persons who now have or may hereafter have a grist mill or other machinery constructed on said river." We maintain that this act for whatever it is worth can not by any fair treatment be made to apply to the Chariton river. There is no stream known to or affected by the county court's proceeding in the organization of this drainage district except the Chariton river. The plat and maps which constitute part of this record name and designate it as the Chariton river; so do also the maps of the State, those that represent the river, name it the Chariton river. That is the only name by which this river is known either to the public, to the record of these pro-

ceedings or through the record of these proceedings and public maps to this court. It is most unreasonable to undertake to apply this act to this river when it is known that this river could not be navigated in the smallest canoe at ordinary stages of water any considerable portion of its course from its mouth to the Iowa line. It is much more reasonable to believe that the Legislature intended this pronunciamento to apply to the Grand river than to the Chariton river, for in fact, the Grand river, which forms the western boundary of Chariton county and empties into the Missouri river on the southern border of the county, of which this court will take judicial notice, is navigable for ordinary crafts the greater part if not all of its course from its mouth to the Iowa line. With these facts in mind it cannot be fairly said that this act of 1845 applied to the Chariton river rather than the Grand river. But whatever conclusion may be reached as to the intention of the Legislature in the passage of this act, according to our view it can have no possible bearing upon this proceeding. It is not within the province of the State Legislature to determine the navigability of a stream. This is a matter entirely under the control of the national government and it was for the national government to determine in the first instance whether a stream would be meandered in the government survey and retained by the government as a public highway, or whether it would be surveyed and sold as other lands. The government having surveyed and passed the title to this river bed, it was not within the power of Congress, much less was it in the power of the State Legislature, to deprive the owners of their proprietary interest in this stream by declaring it a public highway. The title having once passed to the individual owner he could not be deprived of his ownership for any purpose without having his lands condemned, his damages ascertained and payment made therefor. This is fundamental and, we appre-

hend, will not be disputed. Sec. 21, art. 2, Constitution of Missouri; Art. 5, Constitution of United States; Sherman v. Buick, 32 Cal. 241; Curryer v. Merrill, 25 Minn. 1; Cooley's Const. Lim., secs. 87, 164 and 175; People v. Draper, 15 N. Y. 543; Sharplen v. Philadelphia, 21 Pa. St. 147; Winters v. City of Duluth, 82 Minn. 127. Effort is made to justify the action of the Legislature by showing that during that period of the history of our State such acts were common. Such acts were common in those days, and just as harmless. It would be hard to conceive a more innocent pastime for the Legislature to engage in than the making of various and sundry streams in the State either navigable or non-navigable, as it happened to suit the fancy of the Legislature or the caprice of some interested settler. By an act approved February 12, 1839: "So much of Loutre river as lies below Carroll's Mill, is hereby declared a public highway." Would it not have been a disaster to the State had Carroll decided to move his mill either up or down the stream? In that event the Legislature would necessarily have had to declare again as to what part of the stream was a public highway. Again, by an act approved February 8, 1839: "All that portion of Current river which lies above section number ten, in township thirty-one north, of range 6 west, is declared not to be a navigable stream; and it shall hereafter be lawful to have draws built across the same, for the purpose of obtaining water power to propel mills and other machinery, according to the general law of the land in relation to mills and mill dams; provided, that any person who may build a mill dam on said river shall be compelled to provide a good and sufficient way for rafts to pass over or through his said mill dam, at the request of any owner of any mill that shall be constructed and in operation on said river above the point occupied by said mill dam." The care and watchfulness with which the Legislature guarded the vested rights of the mill own-

ers along the stream by the provisions of this act, are
touching.  However hard it may be to discover what
benefits could possibly accrue to anybody from this
legislation, it is quite certain that it was entirely harm-
less. · In fact, the very act relied upon here to con-
stitute the Grand Chariton river, whatever river that
may be, a public highway, means, if it means anything
at all, that the mill owners along the river who then
had or might thereafter have grist-mills might main-
tain mill dams for the purpose of conserving their
water power; and we submit that with dams in the
river wherever a mill owner might choose to locate
his mill, navigation of the river would be a little un-
satisfactory, to say the least.  (14)  (a)  Even if it
could be held that the payment of damages should
be made in money before the taking of the land for
the drainage ditch right of way under the provisions
of our Constitution, yet this statute will not be held
unconstitutional for the reason that section 8299 does
not expressly provide that the payment shall be de-
layed until after the taking of the right of way.  The
statute provides that the payment of these damages
shall be made out of the first money received into the
district fund, subsequent only to the payment of the
costs theretofore paid out by the county.  (b)  If it
should be held, as relators contend it should be, that
that part of article 4, chapter 122, which provides that
the county court shall pay all the costs, except of con-
struction and collection of delinquent assessments or
installments not taxable to petitioners, remonstrators
or appellants, out of the county treasury and the coun-
ty treasury shall be reimbursed out of the first money
received from assessments or from sale of bonds, is in
violation of the constitutional prohibition against the
county's lending its credit, we have only to say that
this provision of the statute is not at all necessary to
the life or existence of the rest of the law, and may by
the court be held invalid without affecting the validity

of the rest of the statute. Haag v. Ward, 186 Mo. 325; State ex rel. v. Birch, 186 Mo. 205.

WOODSON, J.—This is an original proceeding instituted in this court by relators by writ of *certiorari,* in which the record made by the county court of Chariton county in the organization of Drainage District No. 4, as well as the law under which it was organized, being article IV, chapter 122, Revised Statutes 1899, and the amendatory acts thereto, are challenged.

The relators contend that the petition, bond, all the orders of the county court, reports of the viewers, published notices, and everything else that was done in the organization of said district were erroneous and void, because not complying wth the statutes; and also because said statutes violate both the State and Federal Constitution in many particulars.

In view of these numerous and sweeping contentions made by relators, and because of the great importance of this case to the respondents and to the entire people of the State, it will be necessary and it becomes our duty to set out the various records showing the various steps taken by the court and the parties interested in the premises.

The petition in said cause, as appears by the return, was filed in the county court of Chariton county on May 2nd, 1904, and it reads as follows (formal parts omitted):

"We, your petitioners, resident freeholders in said Chariton county and each owning swamp and overflow lands adjacent to the Chariton river, believe that it would be conducive to the public health, convenience or welfare and of public utility or benefit, to cause said Chariton river in said Chariton county, Missouri, to be so constructed, straightened, widened, altered or deepened, so as to prevent the frequent overflows of said river and the great damage to lands adjacent thereto. We believe if said river was

straightened that from fifty to sixty thousand acres of valuable lands, now practically useless, can be made very productive and the taxable value of said lands be greatly increased. We believe that the course of the river can be shortened and confined within a distance of thirty-five miles or less in Chariton county, whereas it now covers a distance of nearly three hundred miles in said county. It is our opinion that the starting point of the proposed improvement should be at the Macon county line where said river crosses the county line, to-wit, about the center of the east line of section 9, township 56, range 16, Chariton county, Missouri, and follow the present bed of said river as near as practical until it reaches the Missouri river near the southeast part of the northeast quarter of section 21, township 52, range 18, Chariton county, Missouri, which said course is more particularly described by a survey thereof and plat herewith filed and marked Exhibit 'A.' It is our desire to issue bonds to pay the expenses thereof. We therefore pray your honorable body to appoint three resident freeholders of said Chariton county who are not interested in said work and not of kin to any persons interested therein, as viewers, together with a competent engineer to assist them, as provided by section 8280, Revised Statutes 1899, to view the premises along and adjacent to the line of the proposed improvement as hereinabove set forth and report to this court whether the proposed improvement is necessary and practicable, and whether it will be conducive to the public health, and of public benefit and utility, and the best route that could be selected for such improvement and whether the work of constructing such improvement should be by allotment to the several interests or by contract without allotment, as provided by said section. And in duty bound your petitioners will ever pray.''

This petition was signed by Theo. Doerrie and about one hundred and twenty-five other landowners,

including one Shire and Karcher, who will be specially mentioned later in connection with the bond filed by the petitioners.

On May 2, 1904, the petitioners filed in said court the following bond:

"We, the undersigned, residents of Chariton county, Missouri, acknowledge ourselves to owe and be indebted to the State of Missouri, in the sum of two thousand dollars, for the payment of which well and truly to be made we bind ourselves, heirs, executors, administrators and assigns firmly by these presents, to be void, however, on the following condition:

"That if the petition now being presented to the county court of Chariton county by Theodore Doerrie, Peter Vitt et al., praying for the straightening and improving of the Chariton river in Chariton county, Missouri, as provided in said petition, shall be denied or the proceedings be for any cause dismissed and the petitioners shall pay all costs of the proceedings under such petition, then this bond to be void, otherwise to remain in full force and effect.

"Given under our hands and seals this February ——, 1904."

Then follow the signatures of all those who signed said petition, including said Shire and Karcher.

Whereupon said county court at its May term, on the second day of May, 1904, made the following preliminary order of record:

"Theodore Doerrie [and 124 others, petitioners named in said order], landowners of Chariton county, Missouri, this day present to the court here their petition as required by section number 8279 of article 4, chapter 122, Revised Statutes of the State of Missouri, 1899, entitled 'Drainage of Swamp and Overflowed Land,' asking the court to cause to be con-

structed, straightened, widened, altered or deepened the Chariton river in said Chariton county, Missouri, so as to prevent the frequent overflow of said river and the great damage to lands adjacent thereto, commencing at a point at the Macon county line where said river crosses the county line, to-wit, about the center of the east line of section 9, township 56, range 16, Chariton county, Missouri, and follow the present bed of said river as near as practicable until it reaches the Missouri river near the southeast part of the northeast quarter of section 21, township 52, range 18, Chariton county, Missouri, the line of which proposed ditch or improvement is more particularly and definitely described by profile and plat accompanying said petition marked 'Exhibit A' on file in this office.

"The said petitioners also present their bond in the sum of two thousand dollars, with Thomas Karcher and Eli Shire as securities, conditioned and payable as the law directs, which is examined, approved and ordered filed.

"It is therefore ordered by the court that Joseph A. Hooper, John Bayne and E. M. Williams, three resident freeholders of said county, who are not interested in the construction of said works and who are not kin to any person interested therein be and they are hereby appointed as viewers, and that Thomas O. Stanley be and he is hereby appointed as a civil engineer to assist them.

"And it is further ordered by the court that said viewers and civil engineers meet in the city of Salisbury, Missouri, on Tuesday, the 24th day of May, 1904, and proceed to view the line of said proposed ditch or improvement and report by actual view of the premises along and adjacent thereto whether the proposed improvement is necessary, practicable or will be conducive to the public health, convenience or welfare, and report the best route for the proposed drain, whether

any portion of the same should be covered and whether the work of constructing the same should be by allotment, to the several interests or be let by contract without allotment, which report shall be in writing and made to this court on the first day of July, A. D. 1904.

"And it is further ordered by the court that the notice required in section number 8281 of article 4, chapter 122, of Revised Statutes of Missouri 1899, be published in the Salisbury Press Spectator, a newspaper published in said county.

"And it is further ordered by the court that C. C. Hammond and J. A. Collett be and they are hereby appointed attorneys for this court in said cause."

Afterwards, on the 1st day of July, 1904, proof of publication was filed in said county court as follows:

"*Proof of Publication of Notice.*

"Whereas, Theo. Doerrie [then follow the names of all of the persons who signed the petition filed in the cause], having filed their petition in the county court of Chariton county, Missouri, asking said court to make the necessary order and cause to be constructed, straightened, widened, altered or deepened the Chariton river in said Chariton county, Missouri, so as to prevent the frequent overflow of said river and the great damage to land adjacent thereto, commencing at a point at the Macon county line where said river crosses the county line, to-wit, about the center of the east line of section nine, township fifty-six, range sixteen, Chariton county, Missouri, following the present river bed of the said river as near as practicable until it reaches the Missouri river near the southeast part of the northeast quarter of section twenty-one, township fifty-two, range eighteen, Chariton county, Missouri, the line of the proposed ditch or improvement is more particularly and definitely described by profile and plat accompanying said petition,

marked 'Exhibit A' and on file in this office. [The dimensions of which exhibit were such as to prevent its being here copied.]

"And, whereas, the said county court has appointed J. A. Hooper, John Bayne and E. M. Williams as viewers and T. O. Stanley as civil engineer to assist them.

"Now, therefore, notice is hereby given that said petition is pending in said county court, and that said viewers will report to this court on the first day of this court to be begun and holden on the first day of July, A. D. 1904.

"In testimony whereof I, H. H. Miller, Clerk of the County Court of Chariton county, Missouri, have hereunto set my hand, affixed the seal of said court at office in the city of Keytesville, Missouri, this 17th day of May, A. D. 1904.

"H. H. MILLER,

"Clerk County Court."

PUBLISHER'S AFFIDAVIT.

"I, the undersigned, one of the publishers and proprietors of the Press Spectator, a newspaper published in the city of Salisbury, county of Chariton, State of Missouri, do hereby certify that the annexed advertisement was published in said newspaper for one consecutive week of the following dates and numbers:

"May 20th, 1904,          No.
           190            No.
           190            No.
           190            No.
           190            No.

"J. L. RITZENTHALER, Publisher.

"Subscribed and sworn to before me a notary public, in and for Chariton county, Missouri, this 30th day of June, 1904.

"Qualified .........., 190 .  Commission expires Jan'y 5th, 1906.

   "(Seal.)                    C. C. HAMMOND,
      "Notary Public for Chariton County, Mo."

Which proof of publication bears the following file mark: "Filed July 1st, 1904, H. H. Miller, County Clerk."

On the 1st day of July, A. D. 1904, the viewers theretofore appointed by the court filed the following affidavit (formal parts omitted):

"We the undersigned viewers, and engineer, having heretofore been appointed by the county court of Chariton county, Missouri, to view the proposed change of the Chariton river in Chariton county as contemplated by the petition of Peter Vitt, Theo. Doerrie et al., now on file in the office of the county clerk of Chariton county, Missouri, being sworn on our oaths, say that we will faithfully and impartially discharge our duties as such viewers and engineer, and that we will make a true and correct report of the work done by us to the best of our knowledge and belief."

On said 1st day of July, A. D. 1904, the said John Bayne, E. M. Williams and J. A. Hooper, viewers, and Thomas Stanley, civil engineer, filed in said county court their report, and an itemized bill of costs, which report is as follows (formal parts omitted):

"In the matter of straightening, widening, altering or deepening the Chariton river and establishing a drainage district in connection therewith as provided by the petition of Theo. Doerrie, Peter Vitt et al., now on file in the office of the county clerk of Chariton county, Missouri.

"We, the undersigned viewers, resident freeholders of said county, not interested in the construction of said works and not of kin to any person interested therein, also the undersigned civil engineer, having heretofore been appointed by said county court to view

the line of the proposed ditch, or improvement, submit the following report:

"We met as directed by order of said court, and after having been qualified by taking oath to faithfully and impartially discharge our duties as such viewers and engineer and to make a true and correct report of work done by us, we proceeded to view the line of the proposed improvement and actually viewed the premises along and adjacent thereto.

"We find the said improvement as proposed in the petition and order of said court, is necessary, practicable and will be conducive to the public health, convenience or welfare, and we report the following described route, as the best line for said proposed drain or improvement:

"Commence about the center of the east line of section nine, township fifty-six, range sixteen, Chariton county, Missouri, and follow the present bed of said river as near as practicable until it reaches the Missouri river, near the southeast part of the northeast quarter of section twenty-one, township fifty-two, range eighteen, Chariton county, Missouri, the line of which proposed ditch, or improvement, is more particularly and definitely described by profile and plat now on file at the office of the clerk of the county court of Chariton county, Missouri, which said profile and plat was made by the undersigned engineer.

"We further report that the entire distance as described in said profile and plat as aforesaid, should be covered and that the work should be let by contract in at least three separate sections, to begin at the north end thereof and end at the south end, and that the ditches and drain so constructed shall be opened.

"And we recommend that the same be established."

Consideration of said report was continued by the county court from time to time until the 23rd of July, 1904, on which day by an order of record said report

was taken under advisement and continued until the regular August term, 1904. At the said August term, on the 2nd day of August, 1904, said county court made and entered of record an order approving said report and ordering the construction of the work, as follows (formal parts omitted):

"It is ordered by the court that the report of John Bayne, E. M. Williams and Joseph A. Hooper, viewers, and Thomas O. Stanley, civil engineer, heretofore filed on the first day of July, 1904, be approved.

"And the court doth order the construction of the work as prayed for by the petitioners in accordance with said report and doth name and designate the district affected by said proposed improvement as Drainage District No. Four of Chariton county, Missouri.

"And it is further ordered by the court that the said John Bayne, E. M. Williams and Joseph A. Hooper, viewers, and the said Thomas O. Stanley, civil engineer, go upon the line of said proposed ditch, to-wit, beginning at a point where the Chariton river enters Chariton county, Missouri, near the center of the east line of section nine, township fifty-six, range sixteen; thence running through Chariton county west of and parallel to the county line between Chariton and Macon counties southward to a point eighty rods south of the northeast corner of section twenty-eight, township fifty-six, range sixteen; thence in a southwesterly direction through said section twenty-eight, to a point 90 rods west of the northeast corner of section thirty-three, township fifty-six, range sixteen; thence in a southwesterly direction through said section thirty-three, to a point one hundred and twenty rods north of the southeast corner of section thirty-two, township fifty-six, range sixteen; thence in a southwesterly direction through said section thirty-two, to a point one hundred and forty rods west of the northeast corner of section five, township fifty-five, range sixteen; thence in a southwesterly direction to a point near the center

of the east half of lot three, of the northwest quarter of said section five; thence southward in said section five, to a point forty rods west of the northeast corner of the northeast quarter of the southwest quarter of said section five; thence in a southwesterly direction through said section five, to a point forty rods east of the northwest corner of section eight, township fifty-five, range sixteen; thence in a southwesterly direction through said section eight, to a point fifty rods south of the northeast corner of section seven, township fifty-five, range sixteen; thence in a southwesterly direction through said section seven, to a point ninety rods east of the northwest corner of section eighteen, township fifty-five, range sixteen; thence southwesterly through said section eighteen, to a point forty-five rods north of the northeast corner of section thirteen, township fifty-five, range seventeen; thence southwesterly through said section thirteen, to a point ninety rods east of the northwest corner of section twenty-four, township fifty-five, range seventeen; thence southwesterly through said section twenty-four to a point one hundred and twenty rods south of the northeast corner of section twenty-three, township fifty-five, range seventeen; thence southwesterly through said section twenty-three, to the northeast corner of the northwest quarter of section twenty-six, township fifty-five, range seventeen; thence south-westerly through said section twenty-six, to a point one hundred and thirty rods north of the southeast corner of section twenty-seven, township fifty-five, range seventeen; thence southwesterly through said section twenty-seven, to a point thirty rods east of the northwest corner of the northeast quarter of section thirty-four, township fifty-five, range seventeen; thence southwesterly through said section thirty-four to a point one hundred and fifty rods north of the southeast corner of section thirty-three, township fifty-five, range seventeen; thence in a southwesterly direction

through said section thirty-three, to a point one hundred and ten rods west of the northeast corner of section four, township fifty-four, range seventeen; thence in a southwesterly direction through said section four, to a point one hundred and ten rods north of the southeast corner of section five, township fifty-four, range seventeen; thence southwesterly through said section five, to a point one hundred and twenty rods west of the northeast corner of section eight, township fifty-four, range seventeen; thence in a southwesterly direction through said section eight, to a point seventy rods north of the southeast corner of section seven, township fifty-four, range seventeen; thence southwesterly through said section seven, to a point forty rods west of the northeast corner of section eighteen, township fifty-four, range seventeen; thence in a southwesterly direction through said section eighteen, to a point one hundred and twenty-five rods east of the northwest corner of section nineteen, township fifty-four, range seventeen; thence southwesterly through said section nineteen, to the northeast corner of section twenty-five, township fifty-four, range seventeen; thence southward through said section twenty-five, to a point forty rods west of the northeast corner of section thirty-six, township fifty-four, range seventeen; thence southward in said section thirty-six, to a point thirty rods west of the southeast corner of the southeast quarter of the northeast quarter of said section thirty-six; thence southwardly through said section thirty-six, to a point ninety rods west of the northeast corner of section one, township fifty-three, range eighteen; thence southwesterly through said section one, to a point thirty rods north of the southeast corner of section two, township fifty-three, range eighteen; thence southwesterly through said section two, to a point forty rods west of the northeast corner of section eleven, township fifty-three, range eighteen; thence southwesterly in said section eleven, to a point where the Wa-

bash Railroad crosses the main channel of the Chariton river about forty rods southeast of the northwest corner of the southwest quarter of said section eleven; thence southwesterly through said section eleven, to a point seventy rods north of the southeast corner of section ten, township fifty-three, range eighteen; thence southward through said section ten, to a point ten rods west of the northeast corner of section fifteen, township fifty-three, range eighteen; thence in a southwesterly direction through said section fifteen, to a point one hundred and ten rods north of the southeast corner of section sixteen, township fifty-three, range eighteen; thence southwesterly through said section sixteen, to the northeast corner of the northwest quarter of section twenty-one, township fifty-three, range eighteen; thence southwesterly through said section twenty-one, to a point one hundred and ten rods south of the northeast corner of section twenty, township fifty-three, range eighteen; thence southwesterly through said section twenty, to a point one hundred and twenty rods west of the northeast corner of section twenty-nine, township fifty-three, range eighteen; thence in a southeasterly direction through said section twenty-nine to a point one hundred and twenty-five rods east of the northwest corner of section thirty-two; township fifty-three, range eighteen; thence southward through said section thirty-two, to the northeast corner of the northwest quarter of section five, township fifty-two, range eighteen; thence south through the center of said section five to the northeast corner of the northwest quarter of section eight; thence south through said section eight, to the northwest corner of the southwest quarter of the southwest quarter of said section eight; thence southeasterly through said section eight, to the northeast corner of the northwest quarter of the northeast quarter of section seventeen, township fifty-two, range eighteen; thence southeastward through said section seventeen, to a point forty-five rods south of

the northwest corner of section sixteen, township fifty-two, range eighteen; thence southeasterly through said section sixteen to a point ninety rods west of the north-east corner of section twenty-one, township fifty-two, range eighteen; thence southeasterly in said section twenty-one, to the Missouri river at a point about forty rods southwest of the southeast corner of the northwest quarter of the northeast quarter of said section twenty-one, township fifty-two, range eighteen, as shown by the plat heretofore filed in the office of the clerk of the county court, marked 'Exhibit A,' and survey and level the same and set a stake at every one hundred feet numbering down stream, mark the intersection of boundaries of lands, township and county lines, landmarks, bench marks and road crossings, and make a report, profile and plat of the same and estimate the number of cubic yards of earth or other substance to be removed and the cost per cubic yard for each section of one hundred feet and for the whole work, and make and return a schedule of lots and tracts of land and public or corporate roads or railroads that will be benefited or damaged by the improvement and the damage or benefit to each tract of forty acres or less, and make a separate estimate of the cost of location and construction and apportion the same to each in proportion to the benefits or damages which will result to each.

"And you are further ordered to apportion and allot the construction of the number of lineal feet and cubic yards of said work to each lot or tract of land, road or railroad in proportion to the estimate of benefits or damages above described and specify the manner and time in which the improvement shall be made and completed, the number of flood gates, waterways, farm crossings, bridges, and the dimensions thereof and note the county and township lines and railroad crossings.

"You are ordered to file with your said report a plat drawn upon a scale sufficiently large to represent all meanderings of said improvement, and said plat shall distinctly show the boundaries of each lot or tract of land and each road or railroad to be benefited thereby, the name of the owner of each tract of land as the same appears upon the tax books at the time, the authority or company in charge or controlling each public or corporate road or railroad, the distance in feet through each tract or parcel of land, together with such other matters as the viewers and the civil engineer may deem material.

"And you shall file therewith a profile showing the surface and the grade and the grade lines.

"You are ordered to file with the clerk of this court within thirty days after making such survey and levels the report, plat and profile above described, together with an itemized bill of costs made in the proper discharge of your duties.

"You are hereby notified that Charles W. Steiman (and about forty-five others, naming them) have filed with this court a remonstrance against the construction of said proposed ditch or improvement, giving the following reasons, to-wit:

"1st. Because said change and alteration is unnecessary, impracticable and not conducive to public health, convenience and welfare.

"2nd. Because the making of said change and alteration will necessitate the expenditure of an enormous sum of money and the result to be obtained will not justify the outlay.

"3rd. Because the making of said change and alteration will cause many thousands of acres of valuable land to be overflowed to greater extent and more frequently than heretofore, and thereby greatly damage the same and destroy its value.

"4th. Because the proposed change and alteration in the course of said river will necessitate the con-

truction of many bridges and roads in Chariton county and thereby be of great expense to all the people of said county.

"5th.  Because this court has no jurisdiction or authority of law to alter or change the course of the Chariton river, it being a navigable stream."

And afterward, at the May term, 1905, of said county court, on the 6th day of May, 1905, said viewers and engineer filed in said county court their final report, as follows (formal parts omitted):

"In obedience to the order of the county court of Chariton county, Missouri, made on the 2nd day of August, 1904, we E. M. Williams, John Bayne and J. A. Hooper, viewers, and T. O. Stanley, civil engineer, beg leave to report that we went upon the line described in said order, to wit:

"Beginning at a point where the Chariton river enters Chariton county, Missouri, near the center of the east line of section nine, township fifty-six, range sixteen."  Then follows a description of the same line as is described in the order of the court ordering them to view the line.  Then the report continues:  "Surveyed and leveled the same, and set a stake at every one hundred feet, numbering down stream, marked the intersections and boundaries of lands, township, range and county lines, bench marks and road and railroad crossings, as the same fully appear by the plat and profile hereto attached.

"We report that said ditch should be constructed on the line as follows:

"Beginning at a point where the Chariton river enters Chariton county from Macon county, being nine hundred feet south of the quarter section corner between sections nine and ten, township fifty-six, range sixteen, run south seventy-five feet west of and parallel to the line between Chariton and Macon counties, south through sections 9, 16, 21 and 28, 15,580 feet to a point twenty-four rods north and seventy-five feet west of

the quarter section corner between sections 27 and 28; thence southwesterly on a one degree curve to a point sixty rods west of the southeast corner of section 28; thence southwesterly to a point sixty-three rods north of the center of section 33; thence southwesterly to a point thirty-six rods south of the quarter section corner between sections 32 and 33; thence southwesterly to a point fifty-one rods west of the northeast corner of section 5, township 55, range 16; thence southwesterly through section 5, to a point forty-nine rods east of the southwest corner of section 5; thence southwesterly through section 8 to a point sixty-nine rods south of the northwest corner of section 8; thence southwesterly through section 7 to a point ninety-seven rods east of the southwest corner of section 7; thence southwesterly through section 18 to a point seventy-six rods south of the northeast corner of section 13, township 55, range 17; thence southwesterly through section 13 to a point six rods north of the southeast corner of section 14; thence southwesterly 150 feet through section 14 to a point seven rods west of the northeast corner of section 23; thence southwesterly through section 23 on a one degree curve, 2,900 feet; thence southwesterly to a point twelve rods west of the quarter section corner between 23 and 26; thence southwesterly through section 26 to a point two rods north of the quarter section corner between 26 and 27; thence southwesterly through said section 27 to a point seventy-five rods west of the quarter section corner between sections 27 and 33, thence southwesterly through said section 34 to a point sixty-seven rods north of the southeast corner of section 34; thence southwest through said section 33 to a point seventy-seven rods west of the northwest corner of section 4, township 54, range 17; thence southwest through section 4 to a point eighty-seven rods north of the southeast corner of section 5. Thence southwest through section 5 to a point thirty-one rods west of the quarter section corner between sections 5

and 8; thence southwest through section 8 to a point twelve rods north of the southeast corner of section 7; thence southwest through section 7 to a point eleven rods west of the northwest corner of section 18; thence southwest through section 18 to a point six rods west of the quarter section corner between sections 18 and 19; thence southwest through section 19 to a point in the Old River channel sixty-six rods south, and eleven rods west of the quarter section corner on the west side of section 19; thence southerly along the said river channel to a point sixty-six rods north, and three rods west of the quarter section corner on the east side of section 25, township 54, range 18; thence southwesterly 840 feet to the old river channel; thence southerly along said river channel to a point eighty-four rods south and thirty-three rods west of the northeast corner of section 36; thence southwesterly through said section 36 to a point ninety-nine rods west of the northeast corner of section one, township 53, range 18; thence southwesterly through section 1 to a point ten rods north of the southeast corner of section 2; thence southwesterly through section 2 to a point twenty-five rods west of the northeast corner of section 11; thence southwesterly through section 11 to a point nine rods east of the northwest corner of section 14; thence southwesterly through section 14 to a point nine rods south of the northeast corner of section 15; thence southwesterly through section 15 to a point fifty-seven rods north and thirty-three rods east of the southeast corner of section 15 to the old river channel; thence southwesterly along the old river channel through sections 15 and 16; thence southwesterly along said river channel to a point sixty rods south and twelve rods west of the quarter section corner between sections 16 and 21; thence southwesterly through said section 21 to a point eighty-four rods north of the southeast corner of section 20; thence southwesterly through section 20 to a point seventy-one rods west of the northeast corner

of section 29; thence southwesterly through section 29, to a point seven rods west of the quarter section corner between section 29 and 32; thence southwesterly 108 rods; thence southeasterly to a point twenty-four rods east of the quarter section corner on the north side of section 5, 52, 18; thence southwesterly eighty-two rods to the line running north and south through the center of section 5; thence south along the center line of section 5 to the quarter section corner between section 5 and 8; thence south along the center line of section 8 to a point ninety rods north of the quarter section corner between sections 8 and 17; thence southeasterly through the southeast quarter of section 8 to a point thirty-three rods east of the quarter section corner on the north side of section 17; thence southeasterly along what is known as Chapman Slough, to a point sixty-six rods south of the northwest corner of section 16; thence southeasterly along said slough through section 16 to a point thirty-one rods west of the quarter section corner between sections 16 and 21; thence southeasterly through said section 21 to the Missouri river, at a point about forty rods southwest of the southeast corner of the southeast quarter of the northeast quarter of section 21, township 52, range 18, where said Chapman Slough empties into the Missouri river, all in Chariton county, Missouri, as shown by a map filed herewith, and hereinafter referred to.

"And that said ditch and improvement shall be in the form and of the dimensions as follows, to-wit:

"The depth as indicated by the line marked 'grade line' on profile herewith filed and hereinafter referred to; and shall be twelve feet wide on the bottom, and the sides have a slope of one foot horizontal to each one foot perpendicular, from the place of beginning to the point where said ditch enters the old channel of the Chariton river in the northwest quarter of section 26, township 54, range 17, being near the mouth of Bee Branch; all the remainder of said ditch shall be dug

to a depth indicated by the line marked 'grade line' on the profile heretofore mentioned, and be fifteen feet wide on the bottom, the sides having a slope of one foot horizontal to each one foot perpendicular, as shown by the following sketch:

"We report that the excavated earth should be deposited along the side of said ditch and no part of said earth closer than five feet to the edge of said ditch.

"We have estimated the number of cubic yards of earth and other substances to be removed and the cost per cubic yard of each section of one hundred feet as follows, to wit:" (Here follows a long table of figures representing the estimates for 1,736 sections of one hundred feet each, which table is omitted, because immaterial to this appeal.)

"We have estimated that the whole number of cubic yards of earth to be removed will be 1,495,655, at a cost of $157,042.50, and that the number of cubic yards of other substance to be removed 'will be nothing. We estimate the number of acres of timber on the right of way to be removed to be two hundred at a cost of $6,857.18.

"We have also made and herewith return a schedule of all lots and land of public and corporate roads and railroads that will be benefited, damaged or condemned by or for the improvement and the damage or benefit to each tract of forty acres or less, and made separate estimates of the cost of location and construction and apportioned the same to each tract in proportion to the benefits and damages that may result to each, and we also apportioned and allotted the construction of the number lineal cubic feet and cubic yards of said work to each lot or tract of land, road and railroad in proportion to the estimate of benefits or damages as above described as follows, to wit:" (Here follows a tabulated statement or schedule, which is omitted.)

"We further report that we have condemned the right of way for said improvement one hundred and fifty feet wide; that is to say, seventy-five feet on each side of the line of the survey hereinbefore described, and assessed the damages to the respective owners of the land so condemned, as shown in the following schedule:" (Here follows a tabulated description of the land condemned for said right of way, with schedule of damages awarded the various landowners, which is here omitted, because immaterial to this appeal.)

"We recommend that the said improvements shall be made as follows, to wit: By the use of dredging machinery, placed on boats, and shall be completed within a period of two years from the date of making contracts therefor.

"We report that there are no flood-gates or water-

ways necessary; that there are nine farm crossings of the following dimensions, to wit: Shall be steel bridges—60-foot span, 12-foot roadway, placed on solid pile foundations capable of bearing a weight of eighty pounds to the square foot; and eight highway bridges of the following dimensions, to wit: 60-foot steel span with a 14-foot wooden approach; fourteen feet wide; capable of bearing a weight of one hundred pounds to the square foot; the span to be placed on tubular piers on pile foundation, filled with concrete; the approaches to be on substantial pile foundations. The location of said farm crossings and high bridges will appear on the map herewith filed and hereafter referred to.

"We have made a profile and plat of the proposed improvement showing all the meanderings thereof, the boundary line of each tract of land and each road and railroad benefited thereby, the name of the owner or owners and all persons interested therein so far as we by diligent effort have been able to ascertain the same, the authority or person having charge, owning or controlling each public road or railroad, the distance in feet through each tract or parcel of land, the surface grade line and grade, which profile and plat are herewith filed and attached to this report and made a part thereof.

"We further report that the survey made by us was completed on the 24th day of March, 1905.

"We submit the following itemized bill of costs made by us in the proper discharge of our duties, to wit:" (Here follow bill of costs and expense account, which are omitted.)

"All of which is respectfully submitted."

This report was accompanied by profile and plat which showed the boundary lines of the district, indicating all tracts of land, including public roads and railroads, which would be affected by the proposed improvement. It also gave a description of every tract

of land affected, and the amount of benefits and damages to be assessed against each tract.

Upon the incoming and filing of this report, notice was, on April 13, 1905, duly given by publication, as provided for by section 8287, Revised Statutes 1899, as amended by section 8287, page 183, Laws 1905, to all persons interested in any way in any of the lands affected by the proposed improvement, setting out the description of every tract of land affected, that the viewers' final report was on file in the office of the county clerk and that on a day fixed in said notice said report would by the county court be heard and considered, and that all persons interested should appear on or before that date and file their objections, if any they had to said report. Proof of the publication of said notice was filed May 6, 1905.

And afterwards, on the 27th day of May, 1905, said county court made and entered of record the following order approving final report of viewers.

"In the Matter of Drainage District Number Four of Chariton County, Missouri.

"The court being fully advised of and concerning all the premises, and finding that the petition for the construction of the proposed ditch is signed by more than five landowners whose lands will be affected by or assessed for the construction of the same; and the court further finding that the said ditch as petitioned for and as recommended by the viewers and engineer heretofore appointed in that regard will be conducive to the public health, convenience and welfare and will be of public utility and benefit,

"It is therefore ordered by the court that the report of the viewers, heretofore, filed on the 13th day of April, 1905, and as amended by this court be and the same is hereby approved in all matters and things.

"And it is further ordered by the court that the said ditch be constructed as provided in said report, and that Thomas O. Stanley, civil engineer, let con-

tracts for the construction of said work, at the court-house in the city of Keytesville, Missouri, on Thursday, the 6th day of July, 1905, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of said day.

"And it is further ordered by the court that the clerk of this court give notice of the letting of said contracts by publication in the Salisbury Press Spectator, a newspaper of general circulation, published in this county, for three consecutive issues, the last insertion to be at least ten days before the letting."

And afterward, on the said 27th day of May, 1905, said county court made and entered of record the following order: (Then follows the order for the issue and sale of the bonds, with copy of same, in usual form.)

Notice was given of the letting of the contracts for the construction of the ditch, and under that notice the contracts were let; also notice was given for the sale of the bonds ordered issued by the court, and the report of the county treasurer shows that when said bonds were offered he received no satisfactory bid for them and all bids made were rejected. The treasurer's report shows that the bonds were objectionable for one reason—on account of their amount—they having been issued in denominations of one hundred dollars.

Acting upon this report of the treasurer, the county court approved the report and made an order for the annulling and cancellation of said bonds; also for a subsequent issue of bonds to the same amount, $180,000, which bonds were to be issued in denominations to suit the purchaser thereof. Under this last order of the court, bonds were issued and sold for cash, bringing $187,700, or a premium of $7,700.

Continuing, the order reads as follows:

"And the court finds to carry into effect the provisions of this order there exists a necessity for the assessment, levy and collection of an annual tax

against the real estate embraced in said district and assessed with benefits in addition to the tax for the current county expenditures a tax sufficient to pay the interest on said bonds as the same become due and a sufficient sinking fund for the payment of the principal of said bonds when they become due.

"It is therefore ordered by the court that the rate of taxation for said interest fund be and the same is hereby fixed at the rate of sixty mills on the one dollar assessed benefits, and that the rate of taxation for said sinking fund be and the same is hereby fixed at the rate of forty mills on the one dollar assessed benefits on the real estate embraced in said drainage district, to be collected annually on or before the 31st day of December in each year, which said sum when so collected shall be used for the purpose of paying the interest and principal of said bonds and for none other.

"And it is further ordered by the court that the clerk of this court be and he is hereby directed to enter a levy as hereinbefore provided upon the tax books against the real estate embraced in said drainage district, and assessed with benefits to be collected in the same manner as state and county taxes are collected."

The purchase price of the bonds was collected by the county treasurer, and was set apart to the said drainage district fund.

The work upon the drainage system progressed until the institution of this suit, at which time almost the entire work had been completed, all bridges provided for had been constructed and practically all the excavation had been made, and nearly all of the money realized from the sale of the bonds had been paid out and distributed to the various contractors. Counsel for the relators filed in this court the following motion to quash the proceeding had in the county court.

"Upon the record and proceedings of said county court in the matter of said Drainage District No. 4,

your petitioner at the relation and to the use aforesaid assigns the following errors:

"1. The county court acquired no jurisdiction in the premises for the reason that the petition filed in said county court shows on its face that the avowed object of its signers, to wit, to straighten the Chariton river, was not within the scope or meaning of the statute of 1899 or the amendment of 1903; and that such object amounted to an unlawful interference with the course of a stream declared by law to be a public highway.

"2. It is not stated in the petition filed in said county court, nor is there any finding or recital in the record or proceedings of said county court, that the Chariton river was or is 'a natural stream not navigable,' so as to authorize the proposed alteration of its channel under the Laws of 1903, p. 234, in force when said drainage proceedings were begun.

"3. Said petition filed in the county court is wholly insufficient for want of any statement therein on the following issuable and jurisdictional facts, to wit: Said petition does not allege or show that the construction of the proposed drain was 'necessary to drain any lots, lands, public or corporate roads, or railroads;' or that the petitioners were 'landowners whose lands will be liable to be affected by or assessed for the construction of' the improvement; nor does said petition set forth the necessity 'for the proposed drain;' nor does it give 'a general description of the proposed ditch or drain, starting point, route and terminus;' nor does it describe any of the lands through which said proposed drain was designed to run; nor the names of any of the landowners, other than petitioners; nor does it give the width of the strip of land sought to be appropriated, or the width of the proposed ditch. And, lastly, said petition is so vague, evasive, indefinite and uncertain as to be misleading.

"4. The record shows that said county court did not acquire jurisdiction of the subject-matter of the proposed drainage scheme for the reason that the bond required by section 8279, Revised Statutes 1899, was not filed. The bond actually filed is wholly insufficient under said section; first, because it does not appear from the face of said bond that any person or persons whosoever, executed or intended to execute the same as sureties; and, second, because it does not appear from the order of the county court approving said bond that the persons who are named in said order as sureties, viz., Thomas Karcher and Eli Shire, were 'freehold sureties,' as required by said section 8279.

"5. The record shows that said county court did not acquire jurisdiction of the subject-matter for the reason that the order appointing the viewers to make the preliminary survey is insufficient and void on account of the same omissions and for the same reasons hereinbefore urged against said petition; and for the further reason that the published notice of the filing of said petition and appointment of said viewers to make such survey describes no lands, gives the names of no landowners other than the petitioners, and does not give a general description of the proposed ditch, 'the place of beginning, route or terminus' thereof, as required by Sec. 8281, R. S. 1899, in force at the time said notice was published.

"6. That it does not appear from the record or proceedings of said county court that said notice of the filing and pendency of the petition and appointment of viewers to make preliminary survey was published in a newspaper 'of general circulation,' as required by Sec. 8281, R. S. 1899.

"7. It appears from said record that the first report of the viewers does not conform to the requirements of Sec. 8284, R. S. 1899, in that said viewers do not describe therein the lands affected nor 'report the best route for the proposed drain;' but refer to an un-

identified profile and plat previously made and filed without apparent authority of law.

"8. The published notice of the filing of the viewers' first report, as shown by the record, was unauthorized and void for the reason that the Act of April 7, 1905 (Laws 1905, p. 180), under which said notice was published, does not in terms or by implication apply to drainage proceedings instituted before its enactment; but on the contrary expressly provides that proceedings already commenced under the sections repealed by said act may be completed under the said repealed sections, which repealed sections include Sec. 8286, R. S. 1899, requiring notice by summons.

"9. Said county court acquired no jurisdiction for the further reason that it does not appear from said record and proceedings that any summons to landowners was ever issued or served as required by Sec. 8286, R. S. 1899.

"10. The final report of the viewers does not conform to the requirements of the Act of 1905.

"11. The order of the county court approving the viewers' final report does not conform to the requirements of Sec. 8288, p. 184, Laws 1905, in that said court did not 'determine whether the required notice had been given' as provided by said section.

"12. The order of re-assessment and re-apportionment made by said county court at its August term, 1905, was entered without authority of law, without notice to the persons concerned, after the matter had been finally passed upon at a former term; and the matters recited and set forth in said order are not sufficient to sustain or justify the making of said order.

"13. The record and proceedings of said county court relating to the assessment of benefits against the lands of these relators and others were and are illegal, insufficient and void for the reason, among other things, that in many instances the description given in said record and proceedings of lands affected

by said assessment is so indefinite and uncertain that said lands cannot be identified by means of such description, so that as to said lands said assessments cannot be legally charged or enforced.

"14. It appears from said record that all and singular the other orders and proceedings of said county court with respect to the levying of assessments, the letting of contracts for construction, and for the issue and sale of bonds, were and are without authority of law and void.

"Your petitioner and the relators named in the caption hereof, because of the reasons of law and errors of record hereinbefore set forth, do therefore pray that said record and proceedings of said county court be annulled and quashed."

## OPINION.

I. The first question to be determined, if we follow the logical order of the proceedings had, should be that involving the sufficiency of the petition filed in the county court of Chariton county by the property-owners, asking for the organization of the drainage district in question.

In order to determine the numerous legal propositions presented by this record, we should have in our minds the various statutes under which the proceedings of the county court were had.

All of the proceedings had in that court prior to April 7, 1905, were had under article IV of chapter 122, Revised Statutes 1899, and all those had subsequent to that day were under that article as amended by an act of that day, found in Session Laws of 1905, pages 180 to 190, with an emergency clause.

The statutes which are of the most importance in the consideration of this case are sections 8278 to 8283, Revised Statutes 1899, and sections 8284 to 8288 of Laws of 1905, pages 182 to 184, entitled, "Lands: Drainage of Swamp and Overflowed Lands."

The sections of the statutes of 1899 read as follows:

"Sec. 8278. The county court of any county in the State of Missouri shall have power at any regular session thereof, when the same shall be conducive to the public health, convenience or welfare, or where the same will be of public utility or benefit, to cause to be constructed, straightened, widened, altered or deepened, any ditch, drain or water-course within said county, when the same is necessary to drain any lots, lands, public or corporate roads, or railroads. The word 'ditch' as used in this article shall be held to include a drain or water-course, or any drain or water-course hereafter constructed. The petition for any such improvement shall be held to include any side, lateral spur or branch ditch, drain or water-course, or levee, the lowering of any lake or other work necessary to secure fully the object of the improvement petitioned for, whether the same is mentioned in such petition or not.

"Sec. 8279. Before any county court shall establish any ditch, drain or water-course improvement, as provided for in this article, there shall be filed with the clerk of the county court of such county a petition signed by one or more landowners, if the improvement be less than five miles in length and by five or more landowners, if it be more than five miles, whose lands will be liable to be affected by or assessed for the construction of the same, setting forth the necessity therefor, with a general description of the proposed ditch or drain, starting point, route, and terminus, and whether it is desired to issue bonds. There shall be filed with such petition a bond in the sum of not less than fifty dollars per mile, payable to the State of Missouri, signed by such petitioner or petitioners, and two or more good and sufficient freehold sureties, to be approved by the county court, conditioned for the pay-

ment of all costs if the prayer of the petition be not granted, or be dismissed from any cause.

"Sec. 8280. When such petition is filed, and such bond approved, the county court shall, if in regular session, or at a called session, appoint three resident freeholders of said county, not interested in the construction of said work and not of kin to any person interested therein, as viewers, and also a competent civil engineer, to assist them, and who shall proceed at once under directions of any order of said court made therein, certified by the clerk, to view the line of the proposed ditch or improvement and report by actual view of the premises along and adjacent thereto whether the proposed improvement is necessary, practicable or will be conducive to the public health, convenience or welfare, and report the best route for the proposed drain, whether any portion of the same should be covered and whether the work of constructing the same should be by allotment to the several interests or be let by contract without allotment, they shall report their finding, in writing, to the county court at a time fixed by said court, and if no time has been fixed, at the next regular term thereof, and the said court shall cause the same to be entered on its records. All viewers and engineers before entering upon the discharge of their duties as such shall take and subscribe an oath to faithfully and impartially discharge their duties as such viewers and engineers and to make a true and correct report of the work done by them.

"Sec. 8281. It shall be the duty of the county court at the time of the appointment of the viewers as above provided to cause a notice of the pendency of said petition and the appointment of said viewers, the place of beginning, route and terminus of said proposed ditch or drain, and the time fixed by said court at which said viewers will make their report, to be given by publication by one insertion in some news-

paper of general circulation published in said county.

"Sec. 8282. If the county court shall find against the improvement, it shall dismiss the petition and proceedings at the cost of the petitioners, and shall issue an itemized bill of all costs, which shall include the *per diem* of the viewers and engineer together with all other costs, including the fees of the county clerk in like manner and with like effect as fee bills are issued by the clerk of the circuit court, and shall be collected as provided by law.

"Sec. 8283. It shall be lawful for any person interested in the location of said proposed ditch or work to file with the court on or before the day set for the making and hearing of the report of the viewers appointed to make such preliminary survey of said proposed ditch or work, a remonstrance or objection, in writing, against the ditch or work as located by the petition and report of the viewers across his lands, by setting forth his grievances therein, which shall be heard by the county court, and filed with the petition, a minute of which shall be made in the certified order to the viewers who shall make the estimates. The petitioners shall be released from their bonds, when the county court shall find from the report of the viewers in favor of making the improvements."

And those of the Laws of 1905 are as follows:

"Sec. 8284. If the county court shall find that the proposed ditch or other improvement is necessary for sanitary or agricultural purposes, or would be of public utility or conducive to the public health, convenience or welfare, it shall cause to be entered upon the record of the court, such finding, and an order appointing the formerly appointed, or another competent civil engineer, and three viewers, one, two, all or none of whom, may, in the discretion of the court, have served as such in making the preliminary survey and report, who shall possess the qualifications, and, before entering upon the discharge of their duties, shall take the oath pre-

scribed by section 8280, and directing them to go upon the line described in the order, and if only the general route has been located, to establish the precise location thereof, where in their judgment the proposed improvement will prove most efficient to survey and level such described or by them established line, and set a stake at every one hundred feet, numbering down stream, mark the intersections and boundaries of lands, township, range and county lines, bench-marks and road and railroad crossings; to determine the dimensions and form of the proposed ditch, levee or other improvement and what disposition shall be made of excavated earth; to estimate the number of cubic yards of earth or other substance to be removed and the cost per cubic yard for each section of one hundred feet, and for the whole work, and to make a report, profile and plat of the same. They shall also make and return a schedule of all lots and lands and of public and corporate roads or railroads that will be benefited, damaged or condemned by or for the improvement, and the damage or benefit to each tract of forty acres or less, and make separate estimates of the cost of location and construction, and apportion the same to each tract in proportion to the benefits or damages that may result to each. If so ordered by the court, they shall apportion and allot the construction of the number of lineal feet and cubic yards of said work to each lot or tract of land, road or railroad, in proportion to the estimate of benefits or damages as above described. They shall specify the manner and time in which the improvement shall be made and completed, the number of flood-gates, waterways, farm-crossings, bridges and dimensions thereof, and note the county and township lines and railroad crossings. The plat shall be drawn upon a scale sufficiently large to represent all the meanderings of said improvement, and shall distinctly show the boundary lines of each lot or tract of land, and each road or railroad to be benefited thereby, the name of the owner or

owners of each tract of land and of any interest therein, so far as they are, by diligent effort, able to ascertain the same, the authority or company having in charge, owning or controlling each public or corporate road or railroad, the distance in feet through each tract or parcel of land, together with such other matters as the viewers or engineer may deem material. Such profile shall show the surface, the grade line and grade, if any fixed, and the viewers and the engineer shall make and file with the report an itemized bill of costs made in the proper discharge of their duties, and shall file their report with the clerk of the court within thirty days after making said survey and levels. If any engineer or viewer shall die, or fail or refuse to qualify and serve as such, the county court may appoint some other person having the prescribed qualifications, who shall, before entering upon the discharge of his duties, take the oath prescribed by section 8280.

"Sec. 8285. In locating a public ditch, drain or water-course or levee, the viewers may, if they deem best, vary from the line described in the petition: Provided, they commence at the point described in the petition and follow down the line described as nearly as practicable; and provided further, that when the ditch described in the petition is insufficent in length to drain the lands adjacent thereto, they may extend the ditch below the outlet named in the petition as far as may be necessary, not exceeding one mile, to obtain sufficient fall or outlet. And when it will not be detrimental to the usefulness of the whole work they shall, as far as practicable, locate the ditch on the division lines between lands owned by different persons; and they shall, so far as practicable, avoid laying the same diagonally across the land, but they must not sacrifice the general utility of the ditch to avoid diagonal lines. And all persons, whose lands may be affected by said ditch, may appear before the viewers and freely express their opinions on all matters pertaining thereto.

"Sec. 8286. The viewers shall have the power to condemn the right of way for the ditch or other improvement; and when damages are allowed persons, their benefits, if benefited, shall be taken into consideration, and their assessments for benefits shall be reduced by the amount of their damages; and if not benefited, they shall be allowed and paid compensation for their damages.

"Sec. 8287. Upon the filing of the report of the viewers, the county clerk shall immediately set the hearing of the same for some day of the next regular term of the county court. He shall thereupon issue, in the name of the state, a notice, directed by name, to every person returned by the engineer and viewers as the owner of every lot or parcel of land affected by the proposed improvement or of any interest therein, and also by name, to all others, whom it may in any manner be ascertained owned such land, or any part thereof, or any interest therein, and also generally to all other persons, without mentioning their names, who may own such land, or any part thereof, or any interest therein, notifying them of the general object and nature of the petition and report of the engineer and viewers, and that, on the day so fixed, the county court will hear said petition and report, and any evidence that may be adduced concerning the same, and requiring them, on the day fixed for the hearing to appear before the county court and show cause, if any they have, why said report should not be confirmed, as made or as the same may by the county court be amended, and the improvements and assessments, therein described or as the report may be amended, made.. Such notice shall contain in appropriate columns, a tabulated description, which may be abbreviated as land descriptions are usually abbreviated, of every lot or parcel of land that will be affected by the proposed improvements, and shall be published in four issues of some weekly newspaper pub-

lished in the county, the last insertion to be before the day set for the hearing.

"Sec. 8288. The court shall first determine whether the required notice has been given. If it finds that due notice has not been given, it shall continue the hearing to a day to be fixed by the court, and cause the notice to be given as provided in section 8287; and when the court finds that due notice has been given, it shall examine the report of the engineer and viewers, and if it appears to the court that the estimates of the cost of location and construction and of damages and benefits to each tract are correct, and that the apportionment of the cost of location and construction is, in proportion to the benefits and damages to each tract, in all things fair and just, it shall approve and confirm the same; if, however, the county court shall find that the apportionments reported by the engineer and viewers are unfair or unjust, and, as made, ought not to be confirmed, it may, by an order of record, amend the report upon the evidence so as to make the apportionments fair and just in proportion to the benefits or damages; if the county court shall find that the location or specification of the ditch or other improvement should be changed it may by an order of record change such location and dimensions, provided that, before the county court shall change the location reported by the viewers, the parties interested shall convey or cause to be conveyed to the drainage district, a right of way for the ditch or other improvement upon the route selected by the county court."

All other sections applicable to the case will only be referred to by numbers, as they are of less importance to the questions involved.

The petition is copied in full in the statement of the case; and there are several objections urged against its sufficiency, which we will now consider.

224 Sup—29

(a)   Counsel for relators insist that the petition filed with the clerk of the county court was fatally defective because it stated the names of no land-owners other than the petitioners.

We do not clearly grasp just what the learned counsel mean by that objection; but we suppose they mean to convey the idea that there were other persons owning lands embraced within the proposed drainage district who neither signed the petition nor were their names mentioned therein.

If we have correctly interpreted counsel's meaning, then we have no hesitancy in saying that their contention is untenable, for the reason that the statute neither requires all the landowners whose lands are to be affected by the drainage district to sign the petition asking for its organization, nor does it require that their names should be stated therein. The statute only requires that before such a district shall be established the petition asking therefor shall be signed by one or more land-owners, where the improvements asked for are less than five miles in length, and by five or more where the improvements are to be more than five miles in length. The return shows that the improvements in question were to be thirty-five miles in length, and that the petition asking for the organization of the district was signed by one hundred and twenty-five resident freeholders of Chariton county, who owned overflowed lands adjacent to Chariton river.

We, therefore, hold that the petition is not vulnerable to the objection made.

(b)   The sufficiency of the petition is next assailed because it did not contain a description of the lands to be embraced in the proposed district.

It is a sufficient answer to that objection to state that the statute makes no such requirement. That and kindred matters are governed by other sections of the statutes and by later proceedings to be had in the case, all of which will be presently considered.

(c)  The petition is also assailed because it does not give the true description—beginning, route or. terminus of the ditch.

Sections 8278 and 8279, before quoted, which prescribe what the petition shall contain, do not require it to state the true description, starting point, route and terminus of the .ditch.  They provide that the petition shall give a "general description of the proposed ditch or drain, starting point, route and terminus." Those matters also are to be made definite and certain at later stages of the proceeding, as provided for by other sections of the statute mentioned.  The petition, however, gives a general description of the proposed ditch or drain.  The starting point is stated with certainty; the general course thereof is made as definite as it could be made in advance of the survey and location to be made by the viewers and engineer, upon whom said section 8280 imposes the duty of determining and fixing the exact location, subject to the approval of the court; and the terminus of the ditch is also definitely fixed by the allegations of the petition.  And in addition to this, the petition referred to a plat and survey therewith filed, which with more particularity described the termini and course of the proposed ditch. That was more than the statute required the petition to state.

The same result was reached by this court in the case of State ex rel. v. Wilson, 216 Mo. 215, where a similar drainage statute was under consideration.

In Cory v. Railroad, 100 Mo. 282, a case involving the condemnation of real estate by the railroad, SHER-WOOD, J., discussing the sufficiency of the description of the real estate to be condemned, said:  "Did the condemning company conform to the provisions of the general law?  It is insisted that the petition does not contain a 'description of the real estate which the company seeks to acquire,' but the petition mentions the particular eighty of the defendant's land over which the proposed road was to be constructed, gives the gen-

eral direction in which it was to run, and then, for a more particular description of the location and course of the road, it refers to a map filed therewith and marked 'Exhibit A' and made a part of the petition. This was a sufficient description under the authority of Railroad v. Story, 96 Mo. 611; and, inasmuch as the map is not attached to the files, we will not assume that it was not all that was asserted concerning it in the petition with which it was filed, and this must be regarded as especially true, since the lower court in its trial of this cause will be presumed to have examined said map and found it sufficient.''

The case of State ex rel. v. Commissioners, 87 Minn. 325, was a drainage case, and in discussing this identical question the court said: ''It is further contended that the description of the proposed ditch, as set forth in the petition, is so indefinite and uncertain as to confer no jurisdiction upon the county commissioners. We do not concur with relators in this contention. The description of the proposed ditch, as contained in the petition, is as follows: 'Commencing at a point in the southwest quarter of the southwest quarter of section eight, the northerly shore of a certain lake, lying and being in said section eight, and section seventeen, town of Queen, Polk county, Minn.; thence running,' etc. The precise objection made to the description is that it is indefinite and uncertain as to the starting point of the proposed ditch. A petition in proper form is, no doubt, a prerequisite to the authority of the commissioners to act, but it is not necessary that the same contain an accurate description of the proposed ditch—either of its starting point or terminus. It is sufficient if the description contained therein be approximately correct. [Kinnie v. Bare, 68 Mich. 625, 36 N. W. 672.] The precise location of the ditch is determined by the civil engineer, and is to be found in his report; and that this report definitely located that point and the entire course of the ditch there is no question [Cribbs

v. Benedict, 64 Ark. 555, 44 S. W. 707.] The petition mentions as the starting point of the ditch a point on the shore of a certain lake in section eight, town of Queen, Polk county. It is a fact of which the court takes notice that congressional townships, when organized, are given a name by the organizing power, and a reference to the town by such name is as definite and certain as though the number of township and range were given. We find nothing in this particular contention, nor in the other points urged by relators, on which to base an order vacating or setting aside the proceedings of the commissioners.''

We, therefore, hold that this contention is without merit.

(d) Counsel for relators next complain of the insufficiency of the petition because the width of the ditch was not stated therein.

Our attention has not been called to any statute which requires the petition to state any such fact, nor have we, after a most careful research, been able to find such a statute; and we conclude none such exists. We must, therefore, decide this contention against relators.

(e) It is finally insisted that the petition is fatally defective because it ''does not show that the petitioners possessed the statutory qualifications.''

As counsel do not state what those qualifications are, we will have to turn to the statute in order to ascertain them. The only section bearing upon that subject is section 8279, and it provides that the petition shall be signed by ''land-owners . . . whose lands will be liable to be affected by or assessed for the construction of the same.'' The language of the petition relating to that matter is as follows: ''We, your petitioners, resident freeholders in said Chariton county, and each owning swamp and overflowed lands adjacent to the Chariton river, believing that it would be conducive, etc., . . . to be so constructed, straightened,

widened, altered or deepened so as to prevent the frequent overflows of said river and the great damage to the lands adjacent thereto."

It is observed by reading those allegations of the petition that it states that the petitioners are owners of swamp and overflowed lands adjacent to Chariton river, and that they believe that the proposed improvements would prevent the overflows of said river and great damage to the lands adjacent thereto. While these allegations are not in the language of the statute, yet they conform to the spirit and meaning thereof, for the reason that, if they owned such lands adjacent to said river and they were subject to frequent overflows by the waters therefrom, then clearly they would "be liable to be affected by or assessed for the construction of said improvements."

Besides that, the county court found that the petition for the construction of the proposed ditch was signed by more than five landowners whose lands would be affected by or assessed for the construction of the same. This finding of the court shows that it placed the same construction upon the allegations of the petition that we have; and for that reason we held that question was adjudicated by that court, and cannot be reviewed on *certiorari*.

There is nothing contained in the opinion of Zimmerman v. Snowden, 88 Mo. 218, that militates in the least against the views above stated. That was a proceeding to open a public road, and it lends its support to, rather than opposes, the views herein expressed, for it says on page 220: "These are jurisdictional facts necessary to be made to appear upon the record somewhere, otherwise, under the former rulings of this court, the proceedings are void."

The case of Township v. Phinney, 53 Mich. 130, has no application to the facts of this case. There the court, without notice, to the landowners, appointed a special drain commissioner under the statute; and the

latter without further notice or authority established a drainage district, and levied a tax for its construction. On *certiorari* the Supreme Court held the act unconstitutional, and all action taken thereunder was null and void. But that is not this case, for our statutes provide for notice to be given to the landowners and give them an opportunity to be heard in opposition to the establishment of the district and the assessment of the taxes with which to pay for the improvements. See sections 8283 and 8286.

We, therefore, rule this contention against relators.

II.   The records of the county court as regards the proceedings had therein in relation to the organization of this drainage district are vigorously assailed by counsel for relators, because the bond filed by the petitioners does not purport to be signed by sureties, as required by said section 8279 of the statutes.

It is true, the return does not disclose that Shire and Karcher signed the bond as sureties, or that they were freeholders, but the court found that to be a fact, and the record so shows.

That presents the proposition, Is the filing of the bond, as required by that section of the statutes, jurisdictional; and if so, does such failure render the entire proceeding in that court null and void? Counsel for relators maintain the affirmative of that proposition, while counsel for respondents deny it.

Counsel for the former rely upon the case of Casey v. Burt County, 59 Neb. 624, as authority sustaining their position. While the bond in that case did not purport to be signed by any surety, yet that fact did not seem to enter into the consideration of the case or to influence the court in reaching the conclusion that the bond was void, and that the proceedings of the county court were invalid for that reason. The only reference to that fact is contained in this language of

the court: ''There are no sureties on the bond.'' In that case the bond did not only fail to show that it was signed by sureties, but it does show that not even all of the signers of the petition asking for the establishment of the drainage district signed it. In fact, it was signed by only two persons, namely, L. D. Peterson and J. P. Morden. The statement of the case shows that the former was one of the petitioners, but there is nothing to show in what capacity the latter signed it, without we must conclude that he was also one of the petitioners, from the fact that the court said, in the opinion, ''There are no sureties on the bond.'' But even those facts did not enter into the consideration of the case; upon the contrary, the opinion was based upon the fact that the terms of the bond varied materially from the requirements of the statute, as will appear from the following excerpt from the opinion:

''Therefore, before a county board can acquire jurisdiction of a proceeding of this nature, a bond complying strictly with the provisions of section 4 of said chapter must be filed and approved. With the provisions of this section, the bond in several important respects fails to conform. There are no sureties on the bond; the liability of the principals is limited to a specific sum, and it is not conditioned for the payment of the costs that may occur in case the board finds against such improvement, as the statute requires, but only provides that if, upon view of said route in the petition described, the commissioners shall find in favor of the location of said ditch, then the obligation to be void, otherwise to be in force. If such a bond is upheld in this case, there could be no reason why a bond providing a penalty limited to one cent, or to nothing, should not also be sustained. Under the conditions of the bond filed, it can be seen that, although the county board might have determined in favor of the location of the ditch, it might have decided against the improvement, on the ground that it was not necessary, or that

it was not conducive to the public convenience, health
or welfare; still the bond would not have been enforce-
able, and the county would have had recourse on no one
for the expense and cost of such proceeding.''

But independent of that opinion, we have no hesi-
tancy whatever in holding that the failure to give the
statutory bond in a proceeding like this is not a juris-
dictional matter. The bond required to be filed is sim-
ply a cost bond, obligating the petitioners to pay the
costs of the proceedings in case the court should deny
the petition praying for the organization of the drain-
age district. It has nothing whatever to do with the
merits of the case; nor can the proceedings in any man-
ner affect the personal or property rights of any per-
son who fails or neglects to sign the petition, asking
for the improvements to be made, until after he has
been fully compensated for his property taken and
damages done to the same thereby. Such a proceeding
is not like an injunction, attachment or replevin suit,
which deprives a person of his personal or property
rights in advance of the trial and judgment of the
court. In all such cases the bond required by the stat-
ute is one of the jurisdictional facts or steps which
must be taken before the process of the court can law-
fully issue. But that is not true here; the bond is
wholly collateral to the process of the court, and is for-
eign to the issues and merits of the case.

The design of the Legislature in requiring the bond
to be given was to secure the cost made in the cause, in
case the proceedings for the organization of the district
failed. It is not, and cannot be, contended that the
bond filed in this case did not as perfectly secure the
costs of the case as it would have done had it been des-
ignated by Shire and Karcher as sureties, instead of
as principals, as it appears. All who signed it appear
to be principals. The only variance in this case that ex-
ists between the bond and the requirements of the stat-

ute, is that the two persons named did not sign the bond as sureties.

But, as before stated, the filing of the bond was not necessary to give the county court jurisdiction in the case. The filing of the petition vested jurisdiction in the court over the subject-matter of the case, and it acquired jurisdiction over the persons of the land-owners upon giving to them the statutory notice of the pendency of the petition, and more especially by the service of the notice upon them as is provided for by section 8286, Revised Statutes 1899, as amended by section 8287, p. 183, of Laws of 1905.

In discussing this last proposition, the Supreme Court of Indiana, in the case of Cauldwell v. Curry, 93 Ind. 363, on page 364, said: ''The filing of the proper petition invokes the jurisdiction of the board of commissioners in the matter of the particular ditch therein described, and the statute invests the board with general jurisdiction of the subject-matter of ditches. . . . The irregularity in accepting the bond with one of the commissioners as surety does not constitute ground for relief, for the reason that the complaint does not show that any injury resulted to the appellants.''

And the same court in the case of Smith v. Clifford, 99 Ind. 1. c. 114, in passing upon this question, said: ''The transcript of the proceedings before the county board, filed as an exhibit with the complaint, shows the filing of the petition, the giving of proper notice, the appointment of the appraisers, and their assessment of the damages and benefits. Sufficient is shown to give the county board jurisdiction of the case, and in such cases all irregularities before the county board are waived by not appealing from their judgment, and their proceedings are conclusively presumed to be correct, and cannot be attacked in this collateral way. [Cauldwell v. Curry, 93 Ind. 363; Town of Cicero v. Williamson, 91 Ind. 541; Foster v. Paxton, 90 Ind.

122; Featherston v. Small, 77 Ind. 143; Marshall v. Gill, 77 Ind. 402.]''

The same question came before the Supreme Court of Michigan in the case of Hall v. Slaybaugh, 69 Mich. 484, and on page 485 Chief Justice SHERWOOD, in speaking for the full court, said': ''It is difficult to conjecture anything pertaining to a drain in any way, that would not come properly under this title if made the subject of legislation. It is the petition, in this class of cases, which gives the commissioner jurisdiction, and, if that is sufficient, the other proceedings after that, if not in accordance with the statute, become irregularities of more or less importance according to the extent of the injury resulting therefrom, and which not unfrequently is so great as to render the whole proceedings void. Such irregularities may be, however, and often are, waived by the party who is to be affected thereby, and when thus waived he cannot be heard to complain thereafter of such irregularity.''

To the same effect is the case of Drainage District v. Railroad, 216 Mo. 709—opinion by VALLIANT, J.

But to escape the conclusion before stated, counsel for relators insist that the proof of publication of the notice of the pendency of the petition is bad, for the reason that the record does not show that it was published in a newspaper of general circulation, as is required by section 8281, Revised Statutes 1899.

There have been so many attacks made upon said notice and the proof of publication thereof, we deemed it proper to set both of them out in full in the statement of the case. The record shows that the notice was published in the ''Salisbury Press-Spectator, a newspaper published in the city of Salisbury,'' but the proof of publication filed by the publisher does not state that it was a paper of general circulation. Upon that showing, counsel for relators insist that the notice was not published in a newspaper of general circulation, and for

that reason it was void and did not bring relators into court.

The case of Koen v. State, 35 Neb. 676, is relied upon to support relators' position. In that case the plaintiff in error was convicted of criminal libel and sentenced to imprisonment in the penitentiary. His conviction was had under section 47 of the Nebraska Criminal Code, which provides: "If any person shall write, print or publish any false and malicious libel of, or concerning another, or shall cause or procure any such libel to be written or published, every person so offending shall, upon conviction thereof, be fined in any sum not exceeding $500, or be imprisoned in the county jail not exceeding six months, or both, at the discretion of the court, and, moreover, be liable to the party injured: Provided, that if said libel is published in a newspaper having a general circulation, the person so offending shall be punished by imprisonment in the penitentiary not less than one nor more than three years." The charge in the indictment was that the defendant unlawfully, maliciously and feloniously did compose, write and publish in a certain newspaper, called *The Kansas City Sun,* published and of general circulation in the county of Douglas, in the State of Nebraska, a certain false, scandalous, malicious, and defamatory libel of and concerning Nettie Wilson. It will be observed by reading the charge in the indictment that the libel was published in *The Kansas City Sun,* which had a general circulation in Douglas county. The indictment thereby negatived the idea that it was a newspaper of general circulation throughout the country by stating in effect that it had only general circulation limited to Douglas county. In that case the Supreme Court held that the indictment did not charge that the libel was published in a newspaper of general circulation; and for that reason it did not charge the defendant with the commission of a felony.

But that is not this case. Here there is no allegation or proof that the Salisbury Press-Spectator was a newspaper of local circulation. In the absence of all evidence upon that subject, the presumption is that it was a newspaper of general circulation; and upon that presumption alone the county court might very well have found that it was a newspaper of general circulation. But whether that is true or not, the county court was acting within its jurisdiction while passing upon the proof of publication; and it must have found, as the record shows it did, that the notice was published in a newspaper of general circulation, for the reason it would have had no authority to inspect the overflowed lands, survey and locate the proposed route of the drainage district until that had been done. [Cochran v. Thomas, 131 Mo. 258, l. c. 279; Scott v. Royston, 223 Mo. 568.]

The Court in the case of State ex rel. v. Wilson, 216 Mo. 215, in speaking of the notice required to be given by a similar statute, held that the rule of law requiring the records of courts of limited and inferior jurisdiction, not proceeding according to the course of the common law, to affirmatively show all the facts the statute requires to be stated does not apply to cases where the law invests the county court with authority to find the existence of those facts before it can acquire jurisdiction, for in such cases the law presumes the court found the facts to be as the statute required. And the Supreme Court of Indiana in the case of Muncey v. Joest, 74 Ind. 409, held that whether there was or was not sufficient notice was a jurisdictional question to be determined by the commissioners, and that their finding could not be collaterally attacked unless the record affirmatively showed that no notice whatever was given.

The county court was not confined to the affidavit of the publisher in determining the question as to whether or not the Salisbury Press-Spectator was a

newspaper of general circulation. It could have called the publisher in person or any other witness it deemed proper, and could have had them testify orally as to the character of the paper's circulation.

In the absence of a showing to the contrary by the record, the law will presume, where the court acted in the matter, that it performed its duty in that regard. Not only that, this record shows that each and every one of these relators not only knew of the pendency of the petition, but it also shows that all of them were actually in court in some form or other and participated at one stage or another in the proceedings, as will more fully appear in a subsequent paragraph of this opinion.

For the reason above stated, we rule this contention also against relators.

III. Counsel for relators next insists that the published notice of the filing and pendency of the petition in the county court on May 2nd, 1904, was insufficient to vest jurisdiction in the county court over relators or their property, for the reason assigned, that it "gives no names save those of the petitioners, describes no lands, outlines no district, but simply invites persons concerned to come to the court house and look at a map."

In considering this question, we must bear in mind that this is purely a preliminary notice notifying all persons interested in or concerned in the swamp and overflowed land adjacent to the Chariton river that the petition asking for the improvement was pending, and that said viewers would report to the county court on the first day of the July term thereof, to be held on July 1, 1904. No district had then been organized, nor had there been any attempt to do so, and for that reason the notice could not state what lands or the names of the owners who would be actually embraced in the proposed district. Those matters could only be deter-

mined after the viewers had inspected the lands, made surveys and plats thereof, and reported the same to the court for its approval or disapproval.

The statute requiring this preliminary notice to be given is section 8281, hereinbefore set out.

We might add, in addition to what we said upon this subject in the previous paragraph, that it is not contended that this notice does not conform to the requirements of that section, but the objection lodged against it goes more to the validity of the statute than it does to the notice, for if the statute is invalid, then the notice must necessarily be bad also. The principal object of that statute was to give notice to all persons whose lands "were liable to be affected by or assessed for the construction" of the proposed drainage system, in order that they might appear in court on the day set for the viewers to report, if they saw proper to do so, and participate in the preliminary steps of the organization. But this section has but little to do with bringing into court the parties whose lands are actually embraced within the boundaries of the proposed district; they were brought into court by virtue of the notice given April 13, 1905, returnable May 6, 1905, in pursuance to the provisions of section 8287 of the Laws of 1905. That notice gave the boundaries of the district, the description of each lot or tract embraced therein and the names of each and all of the owners thereof. There is no pretense but what this notice, if legally · issued, had the effect of bringing all landowners of the district, including relators, into court, where they were given full opportunity to be heard upon all questions involving the organization of the district and the construction of the drainage system. This is the effect of the ruling in the case of State ex rel. v. Wilson, supra.

But it is insisted by counsel for relators, that said notice was illegal, for the reason that when the petition was filed and this drainage proceeding was begun in 1904, section 8286, Revised Statutes 1899, was in force,

and that their regularity and validity must necessarily depend upon compliance with the statute as it then stood, which required personal service by summons upon all landowners affected, or upon their agents. The record discloses, and it is conceded for that matter, that relators were not personally served by summons, nor were their agents, as was required by said section 8286; but the return does show, as before stated, that they were served with notice as provided for by section 8287 of Laws of 1905, page 183, before quoted.

Upon that showing, counsel for respondents insist, that, since said section 8287 of the Laws of 1905 was in force, it governed in the mode of service of process, and that said section 8286 was at that time repealed and had no application to the proceedings in the county court as they then stood.

The simple proposition involved in these contentions is, which statute is to govern the mode of service of the process of the court—the one in force at the time the petition is filed, or the one in force when the process is served upon the defendants?

Counsel for relators contend that to permit the Act of 1905 to apply to the notice given and proceedings had in the county court after its passage would make the act operate retroactively and bring it within the provision of the Constitution prohibiting the enactment of *ex post facto* laws. In our opinion that contention is untenable, for the reason that the Act of 1905 only changed the course of procedure in court, which may be lawfully done pending proceedings therein. This question was presented to this court in the case of State ex rel. v. Drainage District, 192 Mo. 517, and the court there ruled adversely to relators' contention here. The same ruling was had in the following cases: Clark v. Railroad, 219 Mo. 524; State v. Taylor, 134 Mo. 109; Duncan v. State, 152 U. S. 377; State v. Thompson, 141 Mo. 408; State v. Jackson, 105 Mo. 196; Trust Co. v. Donnell, 81 Mo. App. 147.

IV.    Counsel for relators contend in effect that even though it be conceded that the notice last mentioned had the effect to bring all interested parties into court, still the proceedings are void, for the reason that under section 8292, Revised Statutes 1899, and the same section in the Laws of 1903, page 235, they were required to give a cost bond, a condition precedent to the right to file their exceptions or objections to the proceedings, thereby denying or putting a price upon justice in violation of section 10 of article 2 of the Constitution.

If said statute was void, as insisted by counsel for relators, of which we entertain no doubt, then it could not deny any interested party a right to file or to be heard upon his exceptions, as it is suggested it might do.    If they were in court then it was their duty to assail the unconstitutionality of said statute, if it had been interposed as a bar to their right to file their exceptions, or to their rights to be heard thereon. But the fact is the record discloses that no such rights were denied relator or to any others by means thereof.    All who desired filed exceptions to the viewers' report, and were heard thereon.    Independent of that, said section of the statutes was duly repealed by the Act of 1905, before mentioned, which took effect several months prior to the date of the filing of the viewers' report. So, under no circumstances could or did said section deprive relators or any one else of the right to be heard upon their exceptions filed to the report of the viewers.

We must, therefore, hold against relators upon this contention.

V.    The constitutionality of the Act of 1899 (Laws of 1899, pp. 278 to 298; art. 4, chap. 122, R. S. 1899), entitled, " Lands, Swamp: Drainage.    An act to repeal an act of the General Assembly of the State of Mis-

souri, entitled 'An act to enable the owners of swamp
and marshy lands to drain and reclaim them when the
same cannot be done without affecting the lands of
others, prescribing the duties of county courts and
other officers in the premises and to provide for the
repair and enlargement of such drains,' approved
March 26, 1897, and to enact the following sections in
lieu thereof,'' is challenged by counsel for relators upon
numerous grounds, which we will now proceed to con-
sider.

(a)  It is first contended that said act violates sec-
tion 8 of article 4 of the Constitution of 1875, which
provides that ''no bill shall contain more than one
subject, which shall be clearly expressed in the title.''

Counsel state their position in that regard in this
language: ''The constitutional requirement that a leg-
islative bill shall contain but one subject and that sub-
ject be clearly expressed in its title, was obviously
ignored in the Act of 1899 (Laws 1899, p. 278). There
is nothing in the title of that enactment indicative of a
legislative design to repeal statutes governing the ap-
propriation and disbursement of general county reve-
nues.  Yet sections 8299 and 8306, Revised Statutes
1899, authorizing the payment of damages and initial
expenses of drainage ditches out of the county funds
raised by general taxation can only be upheld upon
the theory that they by implication repeal sections
9283 to 9287, which require each fund to be sacredly
devoted to specific uses, and forbid, under severe penal-
ties, their diversion to other purposes.''

We are not quite sure that we grasp the full
meaning of counsel's language just quoted, yet we take
it to mean that the act in question contains two sub-
ject-matters, namely, that said act not only authorizes
the payment of the damages and initial expenses of the
drainage ditches out of general funds of the county,
but it also, by implication, repeals sections 9283 to
9287, Revised Statutes 1899.

Section 9283 requires the county court of each county to divide its revenues into five different funds, namely: first, the pauper and insane fund; second, the road and bridge fund; third, the salary fund for county officers; fourth, the jury, election and fees of witnesses; and, fifth, "a sum sufficient for the payment of the other ordinary current expenses of the county, not hereinbefore specially provided for, which shall be known and designated as the contingent fund of such county; which last sum shall in no case exceed one-fifth of the total revenue of such county for county purposes for any one year."

And section 9286 provides for warrants to be drawn against the pauper fund, and prohibits the treasurer from paying them out of any other fund than the one against which they are drawn. And section 9287 provides how demands against the county may be presented and allowed; how warrants should be drawn by the court; and how they should be presented to and paid by the treasurer of the county.

If sections 8299 and 8306 do not repeal sections 9283, 9286 and 9287, then, clearly, the foregoing position of counsel for relators is not maintainable and must fall. This presents the question, do the former sections repeal the latter, as contended for by said counsel?

It is not contended that they are repealed in express terms, nor is that true as a matter of fact, for the reason that the former in no manner refer to the latter sections. So, if they are repealed at all, they must be repealed by necessary implication, that is, there must be such a repugnancy and irreconcilable conflict between them that both cannot stand. [State ex rel. v. Hopkins, 87 Mo. 519.]

Is that true in this instance? We think not, for the reason that where by any fair interpretation all the sections of the statutes bearing on a given topic

can stand together, then there is no repeal by impli-
cation. [McVey v. McVey, 51 Mo. 406.]

Under this view of the law, the question naturally
presents itself, can all of these statutes be so construed
as to let them all stand? That is, can the money au-
thorized to be paid by sections 8299 and 8306 be paid
by the county treasurer without doing violence to sec-
tions 9283, 9286 and 9287? In our opinion it can be
so paid without violating any one of the last three sec-
tions, and in this way. The demands authorized by the
two former sections could be presented to the county
court for allowance; the court could allow it, and draw
a warrant in favor of the claimant for the amount
thereof against the contingent fund, provided for by
the fifth subdivision of section 9283, and the county
treasurer could pay it out of that fund; and neither the
county court nor the county treasurer would violate
any law by so doing. The contingent fund was created
to meet just such emergencies. [State ex rel. v. Bol-
linger, 219 Mo. 204.]

And the mere fact that the county is to be reim-
bursed by the district for the money so paid does not
alter the situation in the least. A drainage district is
a public and not a private corporation. [Morrison v.
Morey, 146 Mo. 543; State ex rel. v. Drainage District,
192 Mo. 517; Land and Stock Co. v. Miller, 170 Mo.
240.]

And the statute authorizing the county to pay out
of its revenues claims of this character against such
district does no violence to any constitutional provis-
ion to which our attention has been called.

It is well settled law, that money acquired by a
county from the taxation of its citizens is not the pri-
vate property of the county, and an act of the Legis-
lature directing such county to appropriate a portion
of its funds so acquired to pay a part of the public
expenses of a city within its limits is not an appro-
priation of public funds to private use, and is not the

taking of private property for the public use without just compensation. [State ex rel. v. St. Louis County, 34 Mo. 546.]

And in the case of the City of Hannibal v. Marion County, 69 Mo. 571, this court held that the Legislature had the authority to say what shall be done with the taxes levied and collected from any county. There an act of the Legislature required the county to pay to the city out of the general revenue of the county the sum collected from the city for bridge tax and poll tax, and was not unconstitutional.

The rule announced in these cases clearly applies to the facts of this case. This district is as much a public corporation as were the cities of St. Louis and Hannibal; and the taxes collected by Chariton county were no more the private property of the county in this case than were the revenues involved in those cases the private property of Marion and St. Louis counties.

If the Legislature had the authority to apply the revenues of those counties for the purposes therein stated, then for stronger reasons it had the authority to apply the revenues of Chariton county for the purposes herein stated, because the drainage district in question is not independent of the county, but, upon the other hand, it owes its being to and is subject to its authority and control in the same sense in which townships of a county are subject to its control. It does not even have the independent government like townships have under the township organization. The county court administers its entire affairs, and the county clerk keeps its records.

The cases before cited and the views expressed are not in conflict with section 46 of article 4 of the Constitution, as contended for by relators. That section reads as follows: "The General Assembly shall have no power to make any grant, or to authorize the making of any grant of public money or thing of value

to any individual, association of individuals, municipal or other corporation whatsoever: Provided, that this shall not be so construed as to prevent the grant of aid in a case of public calamity.''

That section of the Constitution does not prohibit the Legislature from making use of an individual or a corporation as a means through which it may apply appropriations to lawful purposes.

In the case of State ex rel. v. Seibert, 123 Mo. 424, it was held that a private corporation or individual may be the recipient of funds raised by taxation provided the use to which they are to be devoted is a public one. And in the case of State ex rel. v. City of St. Louis, 174 Mo. 125, it was also held that an ordinance of the city appropriating the expenses that a policeman incurred while in the performance of his duty as such officer, in removing a nuisance from a public street, as expressly required by law, was not a donation of public money to an individual in violation of said constitutional provision.

While this court in the case of State ex rel. v. County Court, 142 Mo. 575, held that an act of the Legislature transferring county taxes to the town of Kirkwood for street purposes was a violation of said constitutional provision and void for that reason, yet that opinion was based upon the fact that the county in that case had no concern or control whatever over the streets of the town. In that case the streets were vested in the town, and its charter gave it the exclusive jurisdiction of and control over her streets.

But not so with these drain ditches. They are acquired by donation, purchase or condemnation, and the titles there are vested either in the drainage district or the county for the use of the public, and under the exclusive charge and control of the county court. The title to the same is not vested in the landowners of the district. That is made clear by the fact that they may be and often are acquired by condemnation.

The landowners by virtue of their ownership of the lands embraced within the district have no authority over the ditches proper. It is true the Drainage Act imposes the duty upon the respective landowners to keep the ditch clear of all obstructions where it passes along or through their lands, but that is not because they have any interest in or authority as individuals over the ditch; but being public aqueducts, the Legislature, through the exercise of the police power, imposes the duty upon them to keep them free from obstructions upon the same principle and authority that it compels the property-owner to keep the sidewalk in front of his property free from snow and other obstructions.

Nor has the drainage district itself any authority or control over the ditches, nor does the law require it to keep the ditches free from obstructions. That is obvious from the fact that it has no officers or means by which it could do so. It is without autonomy, and, as before stated, the exclusive regulation and control over these ditches is vested in the county court, and the Drainage Act imposes the duty upon it to see that they are constructed, maintained and kept free from all obstructions.

We have discussed these matters somewhat extensively for the purpose of showing that they are not only public corporations, but that they are under the sole and exclusive charge and control of the county court, and that the money the court is authorized to expend by said sections 8299 and 8306 is expended for a public and not a private use.

The very case cited and relied upon by counsel for relator, State ex rel. v. County Court, supra, recognizes the very distinction we have here drawn, and in express terms distinguishes that case from the cases of State ex rel. v. Seibert, and City of Hannibal v. County of Marion, supra, which we have before cited and discussed.

. We are, therefore, of the opinion that the act of 1899, the same being amendatory to article 4 of chapter 122 of Revised Statutes 1899, is not violative of either of said sections 28 and 46 of article 4 of the Constitution.

(b) But suppose we should concede that said sections 8299 and 8306, in the particulars suggested by counsel for relators, were violative of said section 46 of the Constitution, still that fact would not have the effect of rendering the entire or any other portion of the Act of 1899 void under said section 28. In other words, the mere fact that one or more sections of an act may violate a constitutional provision, such for instance as section 46, would be no authority or reason for holding that the entire act was double within the meaning of said section 28 of the Constitution, and void for that reason.

Clearly, as before stated, the act of 1899 does no violence to said section 28 in any particular.

But returning to the concession mentioned. Under it, those parts of sections 8299 and 8306 which authorize the county court to pay the damages and initial expenses of the drainage district out of the county's revenues would have to be stricken therefrom, and they would stand as though they had never been inserted therein by the Legislature. Waiving for the present the question as to whether or not the Legislature would have enacted them without those provisions, we will consider the effect that omission would have had upon them and the entire Act of 1899. The questions now presented are, would said sections be valid if those provisions were eliminated therefrom, and the Act of 1899 still be sufficient in its provisions to carry out the objects of its enactment?

The mere statement of the first question answers itself in the affirmative; and, as to the second, we are unable to see in what manner said elimination could have rendered the remaining sections and parts of sec-

tions inoperative. It has been suggested that without those provisions the right of way for the drainage ditch could not be procured by condemnation; that the county court would have no funds out of which to pay the damages sustained by the property-owners on account of the construction of the ditch; and that there would be no money with which to pay the initial expenses of the district.

Concede all three of those suggestions to be true, still that would not render the entire act inoperative and barren, for the following reasons: first, because all of the property-owners could and might, and in some cases I dare say have, donated the right of way for the ditch, and in such case there would be no necessity to condemn land for that purpose; second, there might be no damage whatever done to any property-owner, and even if there would be they could and might, if they saw fit to do so, waive all damages; and, third, the persons to whom the initial expenses would be payable could and might relinquish them, or they might be required to wait for their fees until the taxes provided for by the act could be collected, out of which they could be paid to them, instead of paying them into the county treasury for the purpose of reimbursing the county where it in the first instance pays such expenses. The books are full of cases which hold that officers and citizens may be compelled to serve the public in various capacities and wait for their fees or compensation until the necessary funds for their payment can be collected by taxation.

If all of these matters are true, of which we entertain no doubt, then it could not be seriously contended that the entire Act of 1899 would be null and void even though the Legislature had omitted from sections 8299 and 8306 those portions objected to, for the reason that the act would still prescribe a complete rule of action capable of enforcement.

The law is well settled in this state that although a statute may be invalid or unconstitutional in part, the part that is valid will be sustained where it can be separated from the part which is void. [State v. Clarke, 54 Mo. 17; State ex rel. v. Field, 119 Mo. 593; Ensworth v. Curd, 68 Mo. 282; State v. Bockstruck, 136 Mo. 335; State ex inf. v. Washburn, 167 Mo. 680.]

The only other point to be considered in this connection is, can it be successfully contended that the Legislature would not have enacted these sections of the act, nor the other sections of the act, had the parts objected to been omitted? In other words, were the parts objected to the inducing or controlling cause of the enactment? Certainly not, for the reason they relate only to some of the numerous means by which an end was to be accomplished, namely, the drainage of swamp and overflowed lands; and to hold they outweighed, with the Legislature, the object of the act, and all of the other means by which that object was to be attained, would be attaching undue importance to the parts objected to.

We, therefore, hold this contention of counsel for relators is unsound and untenable.

(c) It is next insisted by counsel for relators that the Act of 1899 is void because it authorizes the taking and damaging of the private property of the landowners of the district for public purposes without just compensation having been first ascertained and paid, which is in violation of the State and Federal constitutions.

This record does not show that any private property was taken or damaged for public use in the case at bar before just compensation was paid therefor. It should be remembered that this case is not an appeal from the proceedings to organize this district and the attempt to take the property of relators for the uses thereof, but that whatever lands have been taken or damaged were taken and damaged and paid for some

two or three years prior to the institution of that suit. Consequently, the insistence before presented is not properly before us for consideration. So we will not cross that bridge until we come to it—"Sufficient unto the day is the evil thereof."

This insistence is also ruled against relators.

(d) The constitutionality of section 8284 is assailed by counsel for relator in the following language:

"Condemnation proceedings are judicial proceedings and can be lawfully exercised only by courts or judicial officers. For this reason section 8284, Revised Statutes 1899, should be held void because it undertakes to control the decision of the county court, and make such decision depend entirely upon the opinion and report of the viewers." And in support thereof they cite the case of State ex rel. v. Nast, 209 Mo. 721.

The proposition of law announced in that case cannot be denied, but we are unable to see its application to the facts of this case, for the reason that we do not agree with learned counsel in the assertion that the decision of the court is controlled by the report of the viewers. While the decision is partly based upon said report it is not entirely so by any means. Interested parties have the right to file remonstrances or exceptions to and frame issues, introduce evidence and otherwise be heard upon the propriety, justice and legality of all such proceedings. The decision of the court is no more controlled by the report of the viewers than is the judgment of the circuit court in partition proceedings controlled by the report of the commissioners appointed by the court to view the land and make partition thereof among the parties interested. The report in that and in this class of cases constitutes important links in the proceedings, but neither controls the action or decision of the court, for the reason that sections 8286 and 8287, in express terms, upon the incoming of the report, make it the duty of the court to notify all parties interested that the report has been

filed, and that they will be given a hearing upon a day stated, and that after according to all who wish to be heard a hearing upon the merits and demerits of the proposed organization, to either confirm or reject the report of the viewers as right and justice may demand. If the report does not accord to the court's judgment as to what is right and just in the premises, then, under the authority of section 8287, the court may reject the report and change the location and dimension of the ditch so as to conform to the judgment of the court. By reading the sections mentioned, it will readily appear that the report of the viewers is absolutely subject to the control of the court, and not the court subject to the report.

This is not a new practice in this State. In most, if not in all classes of condemnation proceedings, the practice is to appoint a commissioner to view the premises sought, and report the benefits and damages which will result to the land of the interested parties, which, upon exceptions filed, the court may confirm or reject the report as law and justice may demand, just as was authorized and done in the case at bar. It would be a supererogation of labor to cite authorities in support of that well settled doctrine in this State.

A master in chancery performs the same functions in chancery practice that the viewers do in this class of cases, and we never before heard of it being contended that the laws which authorize such practice were unconstitutional and void.

We are, therefore, of the opinion that said section 8284 is not violative of section 1 of article 6 of the Constitution, as contended for by counsel for relators.

(e)  The Act of 1905 is alleged to be unconstitutional, for the reason that the published journal of the House fails to show that it was read three times before passage, as required by section 26 of article 4 of the Constitution.

This contention is not tenable, for the reason that

the original bill itself shows that it was in fact read three times before it was put upon its passage. The bill as well as the engrossed copy thereof shows the following endorsements from the House: "Introduced and read first time, Jan. 20, 1905; read second time, Jan. 25; reported favorably by the committee, Jan. 30; ordered to be engrossed, Feb. 1st; engrossed Feb. 3; reported from committee on engrossment, Feb. 7; read third time and passed, Feb. 9, 1905." Endorsements for the Senate: "Reported from House, Feb. 10; read first time, Feb. 13; read second time, Feb. 14; reported favorably from the committee, Feb. 15; taken up and passed March 7, 1905."

While the endorsements made upon the bill in the Senate fail to show that it was read the third time therein before being placed upon its passage, yet the Senate Journal of 1905, page 542, shows that the bill was read the third time and then placed upon final passage and passed that body without a dissenting vote. So the disclosures made by the endorsements upon the bill itself and the record of the proceedings thereon had in the Senate, as shown by the Senate Journal, establish the fact that the bill was enacted in strict conformity to the said constitutional provision. This affirmative showing made by the endorsements upon the bill itself and from the Senate Journal should and does outweigh the negative showing made by the House Journal.

(f) The constitutionality of said article 4 of chapter 122 is assailed for the alleged reason that it is a local or special law within the meaning of section 53 of article 4 of the Constitution.

In view of the rulings of this court bearing upon that question, we are unable to lend our concurrence to that contention. These laws apply to and govern all persons equally who come within their scope. The test, under our decisions, as to whether a statute is local or general is, if it operates upon all persons alike who

come within its scope or range, then it is general, and not subject to the denunciation of said section 53; but, if, upon the other hand, it operates only on a portion of such persons, then it is a special law, and is subject to the inhibition of said constitutional provision. The act here applies to all who are embraced within its provisions. [State v. Etchman, 189 Mo. 648; State ex inf. v. Standard Oil Co., 218 Mo. 1; Coffey v. City of Carthage, 200 Mo. 616.]

(g)   It is finally insisted by counsel for relators that said article is void for the reason that it offends against the XIV. amendment to the Constitution of the United States, which provides, among other things, that no state shall make or enforce any law which will "deny to any person within its jurisdiction the equal protection of the laws."

That provision of the Federal Constitution does not prohibit the legislature of a state from enacting a statute which embraces within its provisions all persons or things that naturally belong to the same class and are similarly situated, and whom it must affect equally and uniformly. [State ex rel. v. Standard Oil Co., supra, and cases there cited.] If we test this article by that rule, then it will be clearly seen that it does not violate that provision of the Constitution, for the reason that it applies to all persons and things of the same class who are similarly situated, and all such are affected alike.

We must, therefore, rule this contention against relators.

VI.   The return of respondents shows that the original bonds issued and ordered to be sold by the county court, with which to procure funds to construct the drainage system, could not be sold because of the smallness of their denominations, namely, $100 each.

On July 6th, 1905, the treasurer of the county duly notified the court of his inability to sell the bonds of

that denomination, as ordered, but had received a bid above par if the court would issue them in larger denominations.    After due consideration the court ordered the bonds which had been issued canceled, and ordered a reissue of them in such denominations as the bidders desired.    This was done, and the treasurer advertised and sold them in pursuance to the order of the court for the sum of $187,700, which was $7,700 above par, subject to the approval of the court.    On September 19, 1905, the treasurer reported those facts to the court, which upon due consideration were approved by the court.    Thereupon the $187,700 was paid to the treasury of the county for the use of said drainage district and out of which the cost and expense of constructing the ditch, etc., were paid.

Counsel for relators assail all of those matters and insist that they are null and void because the court after setting aside the order of appropriation and sale of the bonds was powerless to make the second order of appropriation and for sale of the bonds.

In our opinion that insistence is unsound.    The sale of the bonds and the appropriation of the proceeds thereof to the construction of the improvements were but so many steps to be taken in the completion of the purpose of the organization; and if those steps for any reason were misdirected or rendered ineffectual, then it was clearly the duty of the court to see that they were retraced and such other steps taken within the authority of the enactment which would carry out the purposes thereof. The county court not only had the authority to issue the bonds but it was its duty to sell them for the purpose of raising the necessary means with which to construct the ditch; and if for any formal reason the bonds issued could not be sold, then, clearly, there is nothing contained in the letter or spirit of the enactment which would prevent the court from canceling the first issue and to reissue others in lieu thereof to suit the purchasers, so long as they are

embraced within the purview and object of the act. Otherwise, an unsound exercise of discretion or error of judgment on the part of the court or judges thereof in reference to the form of the bonds might thwart the entire object and purpose of the law and of the organization, even after the interested parties had been put to the trouble and expense of perfecting the latter, and that, too, without any fault upon their part.

The power to issue the bonds in the first instance includes the power to recall and cancel them if they cannot be sold advantageously, and to reissue others in lieu thereof for the same purposes for which the first were issued, but they must, as before stated, conform to the law and be embraced within the act mentioned.

Counsel also assails the validity of that part of the second order of appropriation and sale of the bonds which directs said bonds to be sold "in denominations, size and mechanical structure to suit the purchaser thereof," for the reason assigned, that "it is in direct conflict with the statutory provisions that the county court shall fix the denomination of the bonds in a sum not less than one hundred dollars nor more than five hundred dollars each."

Counsel have not cited us to the statute which they assert was violated by the order above mentioned and we have been unable to find any such; but section 8301, Revised Statutes 1899, as well as section 8301a of the Act of 1905, on page 189 of the Laws of that year, authorize the county court to "issue said bonds in denominations of not less than one hundred dollars, and sell the same to meet the expenses of locating and constructing any ditch or improvement under the provisions of this article," etc.

Counsel evidently are laboring under an erroneous impression when they say the statute limits the denomination of the bonds to $500 each, for the only limitation made by the statute is that they shall be in denominations of not less than $100. The court might

lawfully issue them in denominations of $100 or $100,-000, or in any sum to suit the parties, provided it did not exceed the amount of the authorized issue.

VII. The next insistence of counsel for relators. is that "owners of lands bordering a river have property rights in the stream in its natural state. This right is a property right which the Legislature cannot lawfully destroy without affording some means of compensation."

Counsel for relators contend that no such compensation was awarded them, and for that reason the proceedings should be quashed, or at least that is what we suppose is meant by the use of the following language:

"There is nothing in the law of 1899 or in any of its various amendments providing compensation to landowners on this account, nor is there any other remedy available to the landowner whereby his damages on this score can be made good."

There are two, if not more, complete and satisfactory answers that may be made to that contention.

(a) This record does not show that relators or any one else was damaged in the manner suggested by counsel. If there was no damage, then clearly they would not be entitled to compensation.

(b) We do not concur with the contention of learned counsel in that the law nowhere provides for the payment of compensation for whatever damages a landowner may sustain for being deprived of a stream of water which flows by or passes over his lands by reason of the construction of the drainage ditch.

Section 20 of article 2 of the Constitution expressly authorizes the taking of private property "for drains and ditches across the lands of others for agricultural and sanitary purposes, in such manner as may be prescribed by law," and section 21 of the same article provides "that private property shall not be taken

224 Sup—31

or damaged for public use without just compensation,'' etc.

In pursuance to that constitutional mandate, the Legislature duly enacted the drainage laws we now have under consideration. And whenever private property is about to be taken or damaged in consequence of said improvements, then in steps said section 21 and says all damages done private property by means thereof shall be first paid.

So under those organic provisions, when it becomes necessary for a drainage district to take or damage private property (whether it be water or land) for the purposes of its organization, it must first pay for the property to be so taken and the damage which will be done thereto in consequence thereof. If the value of the property to be taken and the damages which will be sustained cannot be agreed upon then compensation should be allowed for the same in the condemnation proceedings authorized by the acts of 1899 and 1905.

And independent of that, this court at an early day held that said section 21 was self-enforcing and requires no legislation to give it force and effect; and that where a statute or the organic law creates a right, but is silent as to the remedy, the party entitled to the right may resort to any common law action which would afford him adequate and appropriate means of redress. [Householder v. City of Kansas, 83 Mo. 488.] Under that ruling injunction would have afforded relators and all other interested parties perfect protection against all such damages mentioned by counsel for relators.

The point is therefore ruled against relators.

VIII. Counsel for relators contend that the Act of 1899 has no application to natural streams, and that the words ''ditch, drain or water course'' as used in section 1, on page 279 of Laws of 1899, did not include living streams.

Commissioners v. Harbine, 74 Ohio St. 318, is cited in support of that contention. By reading that case it will be readily seen that the wording of the Ohio statute was materially different from that of section 8278, Revised Statutes 1899. In discussing that statute the court said: "That the Legislature did not intend to confer power to convert a stream into a ditch clearly appears from the circumstances existing at the time of the legislation, and it just as clearly appears from the language used, that the word 'water-course' as used in the ditch law is synonymous with the word 'drain.'" From that language it clearly appears that the Legislature had in mind ravines, ditches or drains and not running streams of living water. But if it be conceded that they were of the same in legal import, still that case would be no authority in this case, for the reason that said section 8278 was so amended by the Legislature in 1903 as to read . . . "to cause to be constructed, straightened, widened, altered or deepened any ditch, drain, *natural stream,* not navigable, or water-course, within said county, when the same is necessary," etc. [See Acts of 1903, p. 234, sec. 1.] That act was in force when the proceedings to organize this district were begun, and the same was re-enacted by the Legislature in 1905, and remains in force to this day. [Laws 1905, p. 180, sec. 8278, set out in paragraph one of this opinion.]

And since this district was organized subsequent to the passage of the Act of 1903, it becomes unnecessary for us to determine whether or not section 8278, Revised Statutes 1899, authorized the county court to construct, straighten, widen, alter or deepen the Chariton river, a *natural stream,* etc., for the reason that said section was not then in force, but the Act of 1903 which in express terms authorized its improvement, provided it was not a navigable stream within the meaning of that act.

But counsel for relators insist that even though the court should be of the opinion that the Act of 1903, p. 234, authorized the county court to improve a natural stream, still that act had no application to the Chariton river, for the reason that the act itself in express terms exempts its application to all navigable rivers, to which class they contend Chariton river belongs.

There is no pretense that said river is in fact navigable but the contention is that it is in law a navigable stream. The basis of this contention is an act of the Legislature passed in the year 1845 (Laws 1845, p. 299). That act reads as follows:

"That the Grand Chariton river is hereby declared a public highway from its mouth, where it empties into the Missouri river, to the northern boundary of the State of Missouri; provided, however, that this act shall not be so construed as to affect the right of any person or persons who now have, or may hereafter have, a grist-mill or other machinery constructed on said river."

There is nothing in this record nor in any public document or history of the State, to which our attention has been called, showing that the Chariton river in question is the Grand Chariton mentioned in the Act of 1845. It might be argued that they are one and the same river, for the reason that there is but one Chariton river in the State, and therefore the river in question was the river the Legislature had in mind. Assuming that to be true, the question then is, is the Chariton river a navigable river within the meaning of the Acts of 1903 and 1905?

The Act of 1845 does not so declare it to be a navigable river. The declaration there is that it is "a public highway." Mr. Webster defines the word "highway" as, "A public road; a way open to all passengers. Syn.—Way; road; path; course." And he defines the word "navigable" as, "admitting of being

navigated; affording passage to vessels—as a navigable river.''

The substance of the legal definition of the latter word, as given by Mr. Burrill, is, by the common law, a river is considered navigable only so far as the tide ebbs and flows into it. That is also the doctrine in several of the states, but not of this State. Here all streams which are actually capable of floating and of permitting the passage of ordinary boats upon the bosom of their waters are considered navigable rivers. [Hickey v. Hazard, 3 Mo. App. 480; O'Fallon v. Daggett, 4 Mo. 343.]

One of the elementary rules of statutory construction is, the courts should give to the words of the statute their plain or ordinary and usual meaning, the presumption being that the Legislature used them in that sense.

In the light of these definitions and well established rules of interpretation, can it be said that the Legislature intended to declare the Chariton River to be navigable by the use of the words in the Act of 1845 ''a public highway?'' We think not, principally for the reason that it was not navigable as a matter of fact, and to so construe the act in question would be to convict the Legislature of not only doing a useless thing, but also of enacting a most foolish statute, which is not tolerated by the canons of statutory construction.

If we view this act in the light of numerous other acts of similar import, enacted about that time, it will show that the Legislature was simply trying to declare the channels of all such streams to be public highways so as to preserve the free flow and to preserve the use of the waters thereof unto the millers who had constructed grist-mills or other machinery along their banks.

The following among other acts are similar in character: Acts of 1839, pp. 81, 87, 88; Acts of 1841,

pp. 114-115; Acts of 1843, pp. 69-70; Acts of 1848, pp. 120-121; Acts of 1855, pp. 474, 538 and 625.

The Act of 1839 declared all that part of Fourche-a-curtois creek below Sawyer's Mill to be a "public highway." And the Act of 1841 declared Apple Creek from its mouth to Ingram's Mill to be "a navigable stream," and so on to the end of the list. Almost invariably these acts refer to some mill or mill-dam; and some of them, after declaring the stream to be navigable or a public highway, then, in the same section, expressly authorize the construction or maintenance of a mill-dam or draw across the same, for the purpose of propelling mills and other machinery, according to the general law of the State in relation to mills and mill-dams.

When we consider the size, location and uses to which those streams were then being put, the conclusion is irresistible that the Legislature never once thought of constituting and declaring them and like streams to be public highways in the sense of navigability. No ordinary boat could ply any of them, and but few of them at ordinary stages of water were capable of floating an ordinary canoe, while some of them during the dry seasons would scarcely float a pill box. To hold under this state of facts that it was the design of the Legislature to constitute and declare these small rivers and creeks to be navigable streams within the ordinary meaning of those words would be absurd and a reflection upon the intelligence of the Legislature and upon the court that should so hold. But, as before suggested, the Legislature intended by those and similar acts to grant or license mill-owners along these streams who then had or might thereafter construct grist-mills along any of them, to construct and maintain mill-dams across the same for the purpose of conserving the waters thereof and generating power thereby with which to propel their mills or other machinery. This is the sensible view to take of all such

acts, and the authority to construct and maintain dams across them negatives the idea that they were to be kept open as public highways in the sense of being navigable rivers. Even if navigable (which they were not) before the bridges authorized to be constructed were built, clearly they would not be after those obstructions were thrown across them. The construction and maintenance of bridges across these small streams is absolutely inconsistent with the idea of their navigability.

We, therefore, hold that the Chariton was not a navigable river within the meaning of said Acts of 1903 and 1905, authorizing the organization of drainage districts and the construction of drains as provided for thereby. Consequently, we also hold that neither of said acts exempted the Chariton River from the operation of the drainage laws of the State.

Counsel for respondents insist that the Legislature had no authority to establish and declare the Chariton River to be navigable, even though it had intended to do so by virtue of the Act of 1845, for the reason assigned, that the Federal Government alone possesses that power. Its failure to do so, and the sale and survey of the land through and over which it flows by the United States, conveyed the river as well as the adjoining lands to the purchasers thereof long prior to the passage of said Act of 1845. That being true, learned counsel insists that said act would be void even if it was the intention of the Legislature to thereby establish and declare said river to be a public highway, for the reason that it would violate both the State and Federal Constitutions, which prohibit the taking of private property for public use without just compensation being first paid, which confessedly was not done by said Act of 1845.

As an abstract legal proposition, we think there can be no doubt but what that is true, but notwithstanding that fact, we are unable to see in what possi-

State ex rel. v. Taylor.

ble way that fact could benefit respondents in this case. If the Acts of 1903 and 1905, which provided no navigable stream should be improved under those acts, and the Legislature intended thereby to exempt Chariton River from their operation, then it would be wholly immaterial whether it was in fact navigable or not; or whether the Legislature had the authority to so declare, for the reason that the Legislature, if it had seen proper to do so, could have exempted all natural streams whether navigable or not from its operation, just as was done by the Ohio statute before mentioned.

We, therefore, rule this contention against respondents, but this ruling does not affect the ruling before announced regarding the navigability of the Chariton River.

IX. As stated in a previous paragraph of this opinion, all of the relators were notified of the filing of the viewers' report made to the county court, and the date when the report would be considered by the court; and all of them paid the drainage taxes assessed against their lands.

We will, therefore, omit the above mentioned matters from the subjoined table prepared from the record by counsel for relators, showing the relation each of the relators has borne to this proceeding from its inception, towit:

| | These signed petition for the improvement. | These were remonstrators against petition. | These filed exceptions to assessments. | These received reduction of assessment. | These received damages. |
|---|---|---|---|---|---|
| Lewis M. Applegate. | | | | x | |
| Webster Nance | x | | | | |
| Edward B. Coleman | | | | | x |
| G. L. Sissler | | | x | x | |

State ex rel. v. Taylor.

| Name | | | | | |
|---|---|---|---|---|---|
| Geo. W. Huckaby.... | | | | | x |
| Robert V. Bradley... | | | | | x |
| E. D. Moore........ | | | | | x |
| Lem Bayne ......... | | | | | x |
| H. C. Sasse ........ | | x | | | |
| W. F. Sasse ........ | | x | | | |
| Edward Bucksath ... | | x | | | |
| Wm. H. Bitter...... | | x | | | |
| Henry Berger ...... | | x | | | |
| Carl Schulte ........ | | x | | | |
| Peter Agee ........ | | x | | x | |
| Steven Wilson ...... | | | | x | |
| A. F. Arrington .... | | | x | x | |
| Dan Cuddy ........ | | | | x | |
| Garth Cuddy ....... | | | | x | |
| Josephine Brandt ... | | x | x | x | |
| W. T. Gribble ...... | | | | | x |
| George Wayland .... | | | | | x |
| L. H. Stenbach .... | x | | x | x | |
| H. G. Hall .......... | | | | | x |
| Fr. Richter ........ | x | | | | |
| J. D. Sharp ........ | x | | | | |
| Holbert Miller ...... | x | | | | |
| F. F. Harman ...... | x | | | | |
| F. E. Harman ...... | | | | | x |
| William Garhart .... | x | | | | |
| O. S. Guilford ...... | | | | x | |
| Chris Noll .......... | | | x | x | |
| Andrew Wright .... | | | x | x | |
| Peter Morgan ...... | | x | | x | |
| Ambrose Jackson ... | | x | x | x | |
| Martha Jackson .... | | x | | | |
| Caroline Kuhlman .. | | x | | | |
| R. W. Goll .......... | | x | | | |
| Henry Goll ........ | | x | | | |

It is apparent from the disclosures made by this record that the county court acquired jurisdiction over both the subject-matter of the action and of the land-owners, and for that reason this court might have limited its inquiry into the sufficiency of the petition filed and the publication of the notice of its pendency, together with the sufficiency of the notice given of the filing of the viewers' report, and when it would be presented to and heard by the court; but the importance attached to this case outside of the monetary interest involved has induced us to consider and pass upon most of the questions which were presented to us for determination. However, most of them were not properly before us on writ of *certiorari*, but should have been presented by appeal.

In considering this question, this court, in the case of State ex rel. v. Shelton, 154 Mo. 670, said: "While *certiorari* is the appropriate remedy where an inferior tribunal acts without jurisdiction or in excess of its jurisdiction, or when within its jurisdiction, but the action of such inferior tribunal cannot be reviewed on appeal or writ of error; yet in this State the law is also well settled that it cannot be used as a substitute for appeal or writ of error; and that, where such tribunal has jurisdiction and its action can be reviewed by appeal or writ of error, *certiorari* will not lie."

It has been suggested, however, that an appeal would not lie in this class of cases.

In our opinion that is an erroneous idea. While there is no provision contained in the article under which this drainage district was organized, at the time of its organization, expressly authorizing an appeal from the judgment of the county court confirming or rejecting the viewers' reports, which had the effect of organizing the district, yet as there was nothing in the statutes which withheld that right from all who considered themselves aggrieved by that action of the court, we think there is no doubt but what all of those

who filed remonstrances to the petition and exceptions to the reports of the viewers could have appealed from the action of the court in approving the petition, reports of the viewers and order made organizing the district.

Section 1788, Revised Statutes 1899, provides: "In all cases of appeal from the final determination of any case in a county court, such appeal shall be prosecuted to the appellate court in the same manner as is now provided by law for the regulation of appeals from justices of the peace to circuit courts, and when any case shall be removed into a court of appellate jurisdiction by appeal from a county court, such appellate court shall thereupon be possessed of such cause, and shall proceed to hear and determine the same anew, and in the same manner as if such cause had originated in such appellate court, without regarding any error, defect or informality in the proceedings of the county court."

The action of the county court in ordering the district to be organized was a final judgment and determination of the cause within the meaning of the section just quoted regarding appeals, and a fair construction thereof authorizes an appeal therefrom by those who are aggrieved thereby.

Section 4059, Revised Statutes 1899, gives the right of appeal from a judgment of a justice of the peace to the circuit court, which reads as follows: "Any person aggrieved by any judgment rendered by a justice of the peace, except a judgment by confession, may, in person or by his agent, make his appeal therefrom, unless otherwise provided by law, to the circuit court of the same county where the judgment was rendered; and like appeal may be prosecuted from any judgment or order of such justice sustaining or overruling a motion to retax costs: Provided, the motion to retax costs shall have been filed within ten days

from the entry of the order taxing them of which complaint is made.''

As before stated, it seems perfectly plain that all parties aggrieved by the judgment of the county court organizing the drainage district in question had the right of appeal under the general statutes relating to appeals, before quoted. [State v. Schnider, 47 Mo. App. 669; Railroad v. Railroad, 94 Mo. 535.]

X.    Counsel for respondents interpose numerous questions of estoppel against relators, but since we have taken their view of the case upon all other questions presented, as hereinbefore expressed, it becomes unnecessary for us to pass upon any questions of estoppel.

Entertaining the views herein expressed, we, therefore, overrule the motion to quash the proceedings of the county court, organizing the drainage district in question, and we order that the writ of *certiorari* heretofore issued herein be quashed and for naught held.

All concur except *Valliant, C. J., Lamm* and *Graves, JJ.*, who dissent as to what is said in reference to an appeal lying from the county to the circuit court, and *Fox* and *Gantt, JJ.*, express no opinion upon that point.